**FRANCIS v. LYMAN et al.**
**Civ. A. No. 52721.**

United States District Court
D. Massachusetts.

Dec. 8, 1952.

Isadore H. Y. Muchnick and Richard H. Gens, Boston, Mass., for plaintiff.

John C. Reardon, Edward L. Lanigan, Joseph M. Hargedon, Lawrence, Mass., Herbert L. Barrett, Mathew W. Bullock, Boston, Mass., Antonio de J. Cardozo, Cambridge, Mass., for defendant.

FORD, District Judge.

Plaintiff brings this action under the provisions of the Civil Rights Act, 8 U.S.C.A. § 43, to recover damages for an alleged deprivation of his constitutional rights, in that he was confined as a defective delinquent on an order issued without notice or hearing. He joins as defendants the Judge of a state court who made the order, and those persons who during the period of his confinement served as commissioners of correction or members of the parole board, or as administrative officials of the institutions in which he was confined.

Arguments were held on the motions of defendant Crafts to dismiss and for summary judgment and on plaintiff's motion for summary judgment against Crafts. The material facts, as they appear in the pleadings and affidavits on file, are not in dispute, and the case is one for summary judgment.

Plaintiff, in 1931, voluntarily became an inmate of the Walter E. Fernald State School, an institution maintained by the Commonwealth of Massachusetts through its Department of Mental Health for the custody and education of the feeble-minded. On March 19, 1940, the superintendent of the school applied to defendant Crafts, Special Justice of the Second District Court of Eastern Middlesex, for the transfer of Francis from the school to the Department of Defective Delinquents. This application was made under Mass.G.L.(Ter.Ed.) Ch. 123, § 116, and was accompanied by the report of two experts on insanity as required by the statute. On the same day, March 19, 1940, the defendant entered his order committing Francis to the custody of the Department for Defective Delinquents of the Bridgewater State Farm. He remained in custody there until April 27, 1948 when he was transferred to the Massachusetts Reformatory at Concord. He was provisionally released on November 28, 1951 on a petition to the Massachusetts Superior Court for writ of habeas corpus, and the release was made final and absolute on March 27, 1952.

Defendant sets up the statute of limitations as barring plaintiff's action. Actions under the Civil Rights Act are governed by the applicable state statute of limitations. O'Sullivan v. Felix, 233 U.S. 318, 34 S.Ct. 596, 58 L.Ed 980. It is unnecessary to decide whether the applicable period of limitations is the six-year period provided generally for tort actions by Mass. G.L.(Ter.Ed.) Ch. 260, § 2, or the two-year period for actions for false imprisonments provided by § 4 of that chapter. Plaintiff had at least two years in which to bring his action, and this period runs from the time of his release from prison. Mass.G.L. (Ter.Ed.) Ch. 260, § 7, provides: "If the person entitled thereto is a minor, or is insane or imprisoned when a right to bring an action first accrues, the action may be commenced within the time hereinbefore limited after the disability is removed." The complaint was filed June 23, 1952, well within the two-year period from November 28, 1951. Turner v. Shearer, 6 Gray., Mass., 427, cited by defendant, is inapplicable, since it deals only with the question of whether the imprisonment of the defendant tolls the statute of limitations.

Defendant's principal contention is that since he acted in his judicial capacity as a judge of a court of general jurisdiction he enjoys absolute immunity from suit. It is true that it is the general rule at common law that, on grounds of public policy, a judge who has jurisdiction over the subject matter of the case and over the persons before him is not liable for damages because of an erroneous decision, or even for a decision rendered maliciously and in bad faith. Bradley v. Fisher, 13 Wall. 335, 80

U.S. 335, 20 L.Ed. 646. Allard v. Estes, 292 Mass. 187, 197 N.E. 884.

Plaintiff relies on the statutory provision under which this action is brought as overriding the common law judicial immunity. The statute, 8 U.S.C.A. § 43, provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

The pleadings and accompanying affidavits establish a picture of a situation which, at first blush, falls within the letter of the statute. The defendant, acting as a judicial officer of the state, purporting to act under the authority conferred on him by a Massachusetts statute, and in fact proceeding in exact compliance with the express requirements of the statute, has caused the plaintiff to be deprived of his personal liberty. This was done without notice to Francis and without giving him any opportunity to be heard. Such a proceeding lacked the essential elements of due process. Earle v. McVeigh, 1 Otto 503, 91 U.S. 503, 23 L.Ed. 398; Wise v. Herzog, 72 App.D.C. 335, 114 F.2d 486, 488. Such a deprivation of personal liberty without due process of law was a violation of the rights of Francis under the Fourteenth Amendment.

Defendant argues that his action did not amount to a deprivation of plaintiff's liberty, but was simply an approval of a transfer from one institution to another of an inmate already restrained of his liberty. Such a characterization of the action is untenable, in the light of the facts of the case. Before defendant acted, Francis was a voluntary inmate of a school for the education and custody of the feeble-minded under the supervision of the Department of Mental Health. As a result of the order made by defendant, Francis became an involuntary inmate of the Department for Defective Delinquents in a penal institution under the jurisdiction of the state's Department of Correction. He was admitted to the Fernald School solely upon the ground that he was mentally defective. Before taking action under § 116, the judge was required not only to inquire into his mental state, but also to find that he had engaged in such wrongful conduct as to make him no longer a proper subject for a school for the feeble-minded. A judicial determination was required that in addition to being mentally defective he was also a delinquent, a wrongdoer. The order for committal bears out this view of what was done. It was made on a form furnished by the state Department of Correction, directed to officers authorized to serve criminal process, and expressly referred to Francis as the "defendant" in the proceeding.

This being so, the decisive question is whether the Civil Rights Act is to be interpreted as abolishing the protection placed around judges by the common law, so as to subject a state or territorial judge to liability for damages whenever, by a judicial action within his authority, any one has been deprived of a constitutional right.[1] Read literally, that is what the statute seems to say, for the broad sweep of its language makes it applicable to "every person" who deprives another of his constitutional rights. Plaintiff, of course, contends for such a literal reading, and relies heavily upon the one case wherein decision seems to have rested on such an interpretation of the statutory provision in question. Picking v. Penn. R. Co., 3 Cir., 151 F.2d 240. Cf. United States v. Chaplin, D. C., 54 F.Supp. 926.

It is true that the Picking case apparently is authority for the position taken by plaintiff. The court there states in 151 F.2d at page 250 that the Civil Rights Act "must be deemed to include members of the state judiciary acting in official capacity" and goes on to say that this result "is of fateful portent to the judiciary of the several states." The latter statement is true and

---

1. Also constitute him a potential violator of a criminal statute, 18 U.S.C. § 242.

This statute applies equally to federal judges.

we may expect, with further knowledge of Picking, a plethora of suits against judges of state courts for innocent errors in their judicial decisions that run afoul of the Fourteenth Amendment. For example, under Picking, is a judge of a state inferior court who admits a confession and a judge of a court of last resort who sustains the admission of a confession, which the Supreme Court of the United States later holds was constitutionally inadmissible, liable for damages under the Civil Rights Act? Is the fact that a judge of a state court denies counsel to a defendant in a criminal case, which the United States Supreme Court rules was error, a violation of the Civil Rights Act, making the judge liable for damages? Instances of this sort may be readily multiplied. Where is the end, if Picking is correct as to judges acting within their authority? The court in Picking refers the reader to the opinion of Chancellor Kent in Yates v. Lansing, 1810, 5 Johns., N.Y., 282, where the Chief Justice reviewed the responsibility of judges, in private suits, for their judicial decisions and confirmed the common law principle that judges of courts of general jurisdiction were immune to suits for any act done by them in their judicial capacity. As the Chancellor stated, 5 Johns., N.Y., at page 291, the principle "has a deep root in the common law. It is to be found in the earliest judicial records, and it has been steadily maintained by an undisturbed current of decisions in the English courts, *amidst every change of policy,* and through every revolution of government. A short view of the cases will teach us to admire the wisdom of our forefathers, and to revere a principle on which rests the independence of the administration of justice." (Emphasis supplied.) In Yates, the Chancellor pointed out the principle was met with as early as the Book of Assise, 27 Ed. III, pl. 18. This principle of immunity established in England was indisputably adopted in this country and is firmly established here. Bradley v. Fisher, supra; Yaselli v. Goff, 2 Cir., 12 F.2d 396; Souther v. Reid, D. C., 101 F.Supp. 806, 807; United States v. Chaplin, supra; cf. Ex parte Virginia, 100 U.S. 339, 25 L.Ed. 676.

Is the Picking case sound? With deference, I do not think so. If I read it correctly, it states that Congress intended in the Civil Rights Act to abrogate entirely the privilege of judges so deeply rooted in principles of public policy. If so, that is, to be sure, a fateful portent to the judiciary of the states. Such a conclusion shackles them to a powder keg, where for a similar error under a federal statute a federal judge, under principles of law still prevailing, enjoys complete immunity, at least in the civil courts. Cf. the criminal statute, 18 U.S.C. § 242. See Allen v. Biggs, D. C., 62 F.Supp. 229. It may be true that a literal construction of the Civil Rights Act would sweep the state judges within its provisions, as it reads "every person" who, under color of a state statute, subjects a citizen of the United States to the deprivation of rights, privileges, or immunities secured by the Constitution and laws. I wonder what Chancellor Kent would say, if he were with us, with respect to this interpretation of the Civil Rights Act. Would he not say, and should we not say, that Congress never intended to obliterate entirely the common law principle that had been established more than six hundred years? Chancellor Kent in Yates referred to the principle involved as "a sacred principle of the common law". 5 Johns., N.Y., at page 295. It is reasonable to suppose that Congress, in enacting the Civil Rights Act, must have known of the principle, and it does seem that if Congress intended to abrogate such a well established principle of law they would have said so in plain terms. I realize the matter of the intention of Congress is a baffling question, as Judge Learned Hand describes it in United States v. Klinger, 2 Cir., 199 F.2d 645, and that the result reached here, because of the language of § 43, is not free from doubt, but, on the other hand, I reach my conclusion in order to insure that state judges, in accordance with a sound public policy, may speak freely and vigorously, as they should, in interpreting state statutes which they must construe in the performance of their duties. If a contrary result were reached, to quote Chancellor Kent: "No man would accept the office of judge, if his estate were to answer

for every error of judgment, or if his time and property were to be wasted in litigations with every man whom his decisions might offend". Yates 5 Johns., N.Y., at page 295. And what is of foremost importance, the independence of the judiciary would be seriously impaired if Picking means that the Civil Rights Act wiped out all judicial immunity.

The court in Picking stated that the decisions in Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495; United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368; Ex parte Virginia, supra, and State of Virginia v. Rives, 100 U.S. 313, 25 L.Ed. 667, "foreshadowed" the conclusion reached. I do not agree. These cases were not concerned with the immunity of judges acting within their authority under a state statute. They were concerned, so far as material here, with the meaning of the phrase "under color of any law". There was no indication, in any of the cases cited, which even hinted that the absolute privilege conferred upon judicial officers was abrogated under the Civil Rights Act. The Classic and Screws cases were criminal cases under what is now Title 18 U.S.C. § 242 and dealing with violations of state law and in none was a judicial act involved, as it is in the present case. Also, those cases involved misuse of state authority—violations of state law. Ex parte Virginia was concerned with a judge of a state court who was indicted for discriminating against Negroes in the selection of juries in violation of state law and in violation of the Congressional Act of March 1, 1875, which provided that no citizen should be disqualified for jury service on account of race or color. A petition for a writ of habeas corpus seeking the discharge of the defendant was denied by the court. The court stated that the act alleged to have been committed was in no sense a judicial act—that it was outside the court's authority and in direct violation of the state statute. Obviously, that is not the instant case. There is no misuse of power here. In the Picking case in footnote 12, 151 F.2d at page 251, the court, evidently referring to Ex parte Virginia and not as it says to State of Virginia v. Rives, states that "the Court went on to state that even if it were considered to be a 'judicial act' the judge would be liable to the penalties provided by the statute." I have been unable to find where the court makes any such statement in Ex parte Virginia. Nor, of course, is any such statement made in State of Virginia v. Rives, supra.

I am forced to reach the conclusion that the reasoning in the Picking case has not persuaded me that the cases cited foreshadow the result reached that when a judge is acting within his authority and performs a judicial act that Congress in enacting the Civil Rights Act wiped out all judicial immunity.

■■ Finally, the Civil Rights Act was enacted for the major purpose to secure to Negroes all the civil rights secured to white men and the Fourteenth Amendment was adopted to resolve any doubts as to the power to enact such legislation. Hague v. C. I. O., 307 U.S. 496, 509–510, 59 S.Ct. 954, 83 L.Ed. 1423. If Picking means that the Civil Rights Act should be construed at this late date so as to subject to liability the innocent act of a state judge acting in a judicial capacity and within his authority, it proposes a doctrine of strict liability I cannot subscribe to.

The motions of defendant Crafts to dismiss and for summary judgment are allowed.

I expressly determine that there is no just reason for delay and expressly direct the entry of judgment as to defendant Crafts. Fed.Rules Civ. Proc. rule 54(b), 28 U.S. C.A.