Judith MORGAN, Plaintiff,

v.

George SYLVESTER, Nathaniel Goldstein, Wendell P. Brown, Sydney F. Foster, Christopher J. Heffernan, Francis Bergan, O. Byron Brewster, William H. Coon, Thomas E. Dewey, and MacNeill Mitchell, Defendants.

United States District Court
S. D. New York.

Oct. 26, 1954.

Judith Morgan, New York City, plaintiff pro se.

Nathaniel L. Goldstein, Atty. Gen., Samuel A. Hirshowitz, Asst. Atty. Gen., of counsel, for defendants.

WEINFELD, District Judge.

Plaintiff asserts a claim under the Civil Rights Act[1] against various judicial, executive, and legislative officials of the State of New York. The defendants answered[2] and now move, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, 28 U.S.C.A., for judgment on the pleadings or, in the alternative, for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff and the defendants having submitted affidavits, the motion is treated as one for summary judgment.

Plaintiff, following a suicide attempt, was committed to a state mental institution pursuant to an order of the New York State Supreme Court made after a hearing conducted in accordance with the provisions of the Mental Hygiene Law.[3] She was confined for a period of

1. Civil Rights Act of 1871, now contained in 42 U.S.C.A. §§ 1983, 1985, (formerly 8 U.S.C. §§ 43 and 47).

2. Other than Appellate Division Justice O. Byron Brewster who died prior to the commencement of the action, and the Governor who had not been served at the time this motion was heard.

3. Mental Hygiene Law, McK.Consol.Laws, c. 27, § 74, L.1927, Ch. 426.

sixty-seven days[4] from February 25th, 1947 to May 4th, 1947.

About two years after her release she filed a claim against the State of New York in its Court of Claims[5] to recover damages for (a) illegal commitment to, and detention at, a state mental institution; (b) gross negligence, abuse and denial of medical treatment and hospitalization while confined at the state institution; (c) malfeasance, misfeasance and nonfeasance while held as an inmate; and (d) deprivation of liberty, civil rights, contributing to the death of her mother and personal suffering to plaintiff. The issues were tried before a Judge of the Court of Claims who after a five-day trial rendered judgment dismissing the claim upon the merits. In substance the Trial Court found that the commitment was properly made and issued by a Court of competent jurisdiction, and as to the claim for damages while confined to the mental institution, that the plaintiff had failed to establish her charges by a fair preponderance of the evidence.

Upon appeal by plaintiff to the Appellate Division, Third Judicial Department, the judgment of dismissal was unanimously affirmed.[6] A motion to that Court for leave to appeal to the Court of Appeals was denied,[7] and, finally, a similar motion made directly to the Court of Appeals was likewise denied.[8] Plaintiff never applied for certiorari to the Supreme Court of the United States.

Thereafter, in 1953, at the instance of the plaintiff, a bill was introduced and passed in both houses of the New York State Legislature which, in effect, would have permitted a relitigation of the plaintiff's rejected suit before the Court of Claims, but it was vetoed by the Governor in April 1953. In April 1954, plaintiff requested a State Senator to reintroduce the bill but he refused, as did the member of the Assembly who had sponsored it in the previous session.

The present action followed and is brought against the Judge of the Court of Claims who rendered the judgment against her, the five judges of the Appellate Division who voted affirmance of the judgment, the Attorney General who defended the State's interests before the Court of Claims and the Appellate Division, the Solicitor General who was of counsel on the State's brief submitted to the Appellate Division, the Governor of the State who vetoed the bill, and the Senator who in 1954 refused to reintroduce it.

Plaintiff in the State Court proceedings appeared pro se as she does in the present suit.

■ The complaint, as is not unusual in this circumstance, is prolix, repetitive and contains much irrelevant matter. Stripped of its excessive and at times intemperate verbiage, and construed liberally,[9] it appears to charge that defendants (Par. 4) maliciously and corruptly "conspired to obstruct and defeat the due course of justice with intent to deprive her of her constitutional rights under Amendment XIV of the Constitution of the United States, to the equal protection of the laws and equal privileges and immunities under the laws, and did so deprive plaintiff who had lawfully petitioned the State of New York to be redressed for personal injuries wilfully inflicted on her, * * *" and conspired to and did "injure her in mind, body, property and reputation by inflicting upon her further cruel, inhuman and unusual punishments by grossly oppressive

4. The original order authorized a sixty-day commitment but this was further extended on certification of the duly designated medical officer of the institution at which plaintiff was confined certifying that she was in need of continued care and treatment, as authorized by the statute, Mental Hygiene Law § 74, subd. 7.

5. Court of Claims Act, Art. 2, § 8, L.1939, Ch. 860.

6. Morgan v. State, 278 App.Div. 996, 105 N.Y.S.2d 793.

7. 106 N.Y.S.2d 1015.

8. 303 N.Y. 1014, 102 N.E.2d 840.

9. Rule 8(f), Federal Rules of Civil Procedure, 28 U.S.C.; Dioguardi v. Durning, 2 Cir., 139 F.2d 774; cf. Morgan v. Null, D.C.S.D.N.Y., 117 F.Supp. 11.

injustices for having, exercising and attempting to enforce her constitutional right to a fair trial for the proper redress to which she was lawfully entitled as a substantial right by denying to her the equal protection of the laws."

The next paragraph sets forth alleged overt acts on the part of individual defendants which may be summarized as follows:

(a) The Trial Judge and the Attorney General withheld "five subpoenaed 'adverse and hostile' witnesses from attending the trial to testify";

(b) The Trial Judge impeded the presentation of her case by

(1) obtaining her consent to examine a witness over the telephone;

(2) aiding witnesses hostile to her and curtailing their examinations;

(3) manifest hostility to a witness called by her;

(4) refusing to afford plaintiff an opportunity to submit a brief; and, finally,

(5) deciding the case against her despite "a veritable mountain of credible and convincing evidence";

(c) The State Solicitor General by submitting a brief to the Appellate Division "replete with fraudulent and wilfully distorted statements of the facts and testimony showing an utter disregard for the indisputable documentary evidence";

(d) The Justices of the Appellate Division by affirming the "fraudulent" dismissal of the claim notwithstanding that one of them, the Presiding Justice, at the end of her oral argument, had advised her "that she had proven a conclusive case, that her claim would be 'sent back to the lower court' for an award of damages or a new trial'";

(e) The Governor by vetoeing the bill passed by the Legislature which would have permitted a rehearing of her claim;

(f) The State Senator by his refusal to aid the plaintiff further in her right again to appeal to the Legislature.

The complaint further alleges that all of the acts were committed by the various defendants under color of law and intended to obstruct and defeat the due course of justice and to deprive plaintiff of (a) her constitutional right under the Fourteenth Amendment to the equal protection of the laws and the equal privileges and immunities under the law; (b) her constitutional right to a fair trial; (c) her right to petition for redress of grievances.

■ Thus, plaintiff's claim essentially rests upon § 1985 of Title 42 U.S.C., which grants a right of action "if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, * * * the due course of justice in any State * * * with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws". This section and its companion section, 1983, "gave a right of action, sounding in tort, to every individual whose federal rights were trespassed upon by any officer acting under pretense of state law."[10] However, the defendants contend that this right of action granted by the apparently unqualified language of the Civil Rights Act is not unlimited. They urge that as legislative, judicial and quasi-judicial officials, they are immune from civil liability for acts performed within the scope of their official duties.

■ The basic issue is whether or not the Civil Rights Act of 1871 abrogated the pre-existing absolute immunity of judicial and legislative officers from civil liability for acts performed in the course of their official duties. As to legislators, Tenney v. Brandhove, 341 U.S. 367, 71

10. Bottone v. Lindsley, 10 Cir., 170 F.2d 705, 706. However, the two sections grant separate and distinct rights of action. Section 1983 does not give a cause of action for denial of equal protection of the laws, nor does Section 1985 give a cause of action for denial of due process. Ibid; Gregoire v. Biddle, 2 Cir., 177 F.2d 579.

S.Ct. 783, 95 L.Ed. 1019, upheld the continued existence of the immunity. However, the issue as to judicial officers has not as yet been passed upon by the Supreme Court and those Courts of Appeals which have considered the issue are not in accord. Thus, Picking v. Pennsylvania R. Co., 3 Cir., 151 F.2d 240 and McShane v. Moldovan, 6 Cir., 172 F.2d 1016, hold that the common law immunity of judges from civil suit was overridden by the Civil Rights Act, whereas the more recent case of Francis v. Crafts, 1 Cir., 203 F.2d 809, takes the contrary view.[11]

However unsettled the law on this subject may have been up to the present, I am persuaded that the Supreme Court ruling in Tenney v. Brandhove, supra, charts a clear course. There the Supreme Court held that the Civil Rights Act did not abrogate the immunity enjoyed by legislators, for acts performed within the scope, and during the course, of their official duties, whether maliciously motivated or otherwise. After reviewing the long and historic struggle of the English Parliament to secure the privilege of freedom from arrest or civil process for things said or done during the course of legislative proceedings and the adoption of that hard-won principle by early American legislative bodies, Mr. Justice Frankfurter posed the rhetorical question:

"Did Congress by the general language of its 1871 statute mean to overturn the tradition of legislative freedom achieved in England by Civil War and carefully preserved in the formation of State and National Governments here? Did it mean to subject legislators to civil liability for acts done within the sphere of legislative activity?"[12]

And speaking for the Court he answered:

"We cannot believe that Congress —itself a staunch advocate of legislative freedom—would impinge on a tradition so well grounded in history and reason by covert inclusion in the general language before us."[13]

Judicial immunity is even more deeply rooted, and rests upon public policy considerations at least as compelling as that which supports immunity for legislators. It may be traced back to the earliest judicial records of the English Courts.[14] The necessity for absolute immunity of judges from civil suits was recognized from the earliest beginnings by American Courts as a concomitant of an independent judiciary.[15] In Yates v. Lansing, 5 Johns., N.Y., 282, Chancellor Kent reaffirmed this principle in an action under the New York Habeas Corpus Act, which, like the Civil Rights Act, by its

---

11. The result reached in Francis v. Crafts, 1 Cir., 203 F.2d 809, certiorari denied 346 U.S. 835, 74 S.Ct. 43, draws considerable support not only from Tenney v. Brandhove, 321 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019, but also from Bottone v. Lindsley, 10 Cir., 170 F.2d 705; Campo v. Niemeyer, 7 Cir., 182 F.2d 115, which is closely analogous to the present case; Moffett v. Commerce Trust Co., 8 Cir., 187 F.2d 242.

The diversity of opinion among the several Courts of Appeals is also reflected in the divergent views of the District Courts which have considered the question. Compare Souther v. Reid, D.C.E.D. Va., 101 F.Supp. 806; Francis v. Lyman, D.C.Mass., 108 F.Supp. 884, with Cooper v. Hutchinson, D.C.D.N.J., 88 F.Supp. 774, 781; Morgan v. Null, D.C.S.D.N.Y., 117 F.Supp. 11.

This Court's dictum in Morgan v. Null,

supra, was based on the decision in Picking v. Pennsylvania R. Co., 3 Cir., 151 F.2d 240. But that position must be re-examined in the light of the persuasive reasoning of Francis v. Crafts, supra, in support of the opposite conclusion.

12. Tenney v. Brandhove, 341 U.S. 367, 376, 71 S.Ct. 783, 788.

13. Ibid.

14. Book of Assise, 27 Ed. III, pl. 18; Miller v. Seave, 2 Black Rep. 1141; Hammond v. Howell, 1 Mod. 184; 2 Mod. 218. The history of the judicial immunity is traced in Yates v. Lansing, 5 Johns., N.Y., 282, and Yaselli v. Goff, 2 Cir., 12 F.2d 396, 56 A.L.R. 239.

15. Yates v. Lansing, 5 Johns., N.Y., 282, affirmed 9 Johns., N.Y., 395, 398; Phelps v. Sill, 1 Day, Conn., 315.

terms created civil liability against any person violating its provisions. "Ought such a sacred principle of the common law, as the one we have been considering, to be subverted, without an express declaration to that effect?" queried the Chancellor. He then answered: "[Judges] *must* decide and act according to their judgment, and therefore the law will protect them."[16]

The rule is stated as emphatically by Mr. Justice Brewer of the Supreme Court: "With respect to all judicial officers,—justices of the peace, as well as judges of the higher courts,—the settled law of the supreme court of the United States * * * is that, where they act within their jurisdiction, they are not amenable to any civil action for damages. No matter what their motives may be, they cannot be inquired into."[17]

With the doctrine of judicial immunity so firmly imbedded in English and American law, it is pertinent to ask a question parallel to that posed by the Supreme Court in the Tenney case: "Did the Congress by the Civil Rights Act intend to do away with this long-recognized immunity intended to secure an independent judiciary?" Nothing warrants the assumption that to achieve the well-known objectives of the Civil Rights Act the Congress intended any such result.

 There is conflicting authority as to whether the Attorney General and the Solicitor General as quasi-judicial officers are protected by the doctrine of immunity.[18] But it is unnecessary to decide that issue since the complaint fails to assert a cause of action against them. Obviously, no provision of the Court of Claims Act denies plaintiff the equal protection of the laws, discriminates against her in any way or denies her any right, privilege or immunity thereunder given to any other citizen. The doors of the Court of Claims were open to her, as they were to any other citizen, for the assertion of claims against the State. The State Act being fair on its face and beyond attack, the only basis upon which a claim may be predicated is intentional and purposeful discrimination against her. If, as she claims, her suit before the Court of Claims was maliciously and corruptly disposed of by those charged with its determination, at most this represents an individual wrong against the plaintiff for which the Civil Rights Act furnishes no ground for relief.[19] But plaintiff does not allege that these officials in defending the State's interests, in accordance with their statutory duty,[20] were engaged in a purposeful and intentional discrimination against her. The allegation that the defendants engaged "in a purposeful and systematic discrimination designed to favor the politically protected employees * * * of the State of New York" does not bear on any alleged unequal, intentional and discriminatory treatment as between plaintiff and other litigants before the Court of Claims and none of the so-called overt acts alleged in paragraph 5 of the complaint in any respect supports a charge of purposeful discrimination against the plaintiff. As the Fifth Circuit Court of Appeals said in McGuire v. Todd, 198 F.2d 60, 63:

"* * * [A]s other courts have done, we disregard, as mere conclu-

16. 5 Johns., N.Y., 282, 295, 296; and see Phelps v. Sill, 1 Day, Conn., 315, 329; Floyd and Barker, 12 Coke 23.

17. Justice Brewer was sitting as a Circuit Judge in Cooke v. Bangs, C.C.D. Minn., 31 F. 640, 642.

18. Compare Gregoire v. Biddle, 2 Cir., 177 F.2d 579; Viles v. Symes, 10 Cir., 129 F.2d 828; Yaselli v. Goff, 2 Cir., 12 F. 2d 396, 56 A.L.R. 239; Dunn v. Estes, D.C.Mass., 117 F.Supp. 146 with Lane v. Wilson, 307 U.S. 268, 59 S.Ct. 872, 83

L.Ed. 1281; Burt v. City of New York, 2 Cir., 156 F.2d 791; McShane v. Moldovan, 6 Cir., 172 F.2d 1016; Picking v. Pennsylvania R. Co., 3 Cir., 151 F.2d 240; Robeson v. Fanelli, D.C.S.D.N.Y., 94 F.Supp. 62.

19. Love v. Chandler, 8 Cir., 124 F.2d 785; Campo v. Niemeyer, 7 Cir., 182 F.2d 115, 118; Moffett v. Commerce Trust Co., 8 Cir., 187 F.2d 242.

20. New York Executive Law, McKinney's Consolidated Laws, c. 18, § 63; cf. Yaselli v. Goff, 2 Cir., 12 F.2d 396.

sions, the loose and general, the factually unsupported, characterizations of the complained of acts of the defendants, as malicious, conspiratorial, and done for the purpose of depriving plaintiffs of their constitutional rights; that the things defendants are alleged to have done, as distinguished from the conclusions of the pleaders with respect to them, do not constitute a deprivation of the civil rights of plaintiffs, do not give rise to the cause of action claimed; and that the judgment dismissing the complaint should be affirmed."

And as the Supreme Court pointed out in Snowden v. Hughes, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497:[21]

"The unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination. This may appear on the face of the action taken with respect to a particular class or person, cf. McFarland v. American Sugar Ref. Co., 241 U.S. 79, 86–7 [36 S.Ct. 498, 501, 60 L.Ed. 899], or it may only be shown by extrinsic evidence showing a discriminatory design to favor one individual or class over another not to be inferred from the action itself, Yick Wo v. Hopkins, 118 U.S. 356, 373–4 [6 S.Ct. 1064, 1072, 1073, 30 L.Ed. 220]. But a discriminatory purpose is not presumed, Tarrance v. Florida, 118 U.S. 519, 520 [23 S.Ct. 402, 403, 47 L.Ed. 572]; there must be a showing of 'clear and intentional discrimination', Gundling v. Chicago, 177 U.S. 183, 186 [20 S.Ct. 633, 635, 44 L.Ed. 725]; see Ah Sin v. Wittman, 198 U.S. 500, 507–8 [25 S.Ct. 756, 49 L.Ed. 1142]; Bailey v. Alabama, 219 U.S. 219, 231 [31 S.Ct. 145, 147, 55 L.Ed. 191]."

Similarly, the allegation that defendants acted wilfully and maliciously does not give vitality to her claim for as also pointed out in Snowden v. Hughes, supra:

"The lack of any allegations in the complaint here, tending to show a purposeful discrimination between persons or classes of persons is not supplied by the opprobrious epithets 'willful' and 'malicious' applied to the Board's failure to certify petitioner as a successful candidate, or by characterizing that failure as an unequal, unjust, and oppressive administration of the laws of Illinois."[22]

As to the Governor, nothing more need be said than that the exercise of the executive prerogative to approve or veto a bill passed by the Legislature may not be made the subject of a claim under the Civil Rights Act.

This action is a clear attempt, despite plaintiff's assertion to the contrary, to obtain a review and a retrial of the State Court proceedings. The fact that a defeated litigant is prepared to charge a "conspiracy" recklessly or otherwise and recite in haec verba the language of the Civil Rights Act does not give a right of review in the Federal Courts. To uphold the claim here advanced upon such conclusory allegations "would open the door wide to every aggrieved litigant in a state court proceedings, and set the federal courts up as an arbiter of the correctness of every state decision."[23]

This case demonstrates forcibly the wisdom of the public policy which grants immunity to judicial and other officials for acts performed in the discharge of their duties. If in circumstances such as this defendants may be made to answer for their determinations, not only would the independence of the judiciary be un-

21. 321 U.S. 1, 8, 64 S.Ct. 397, 401.

22. 321 U.S. at page 10, 64 S.Ct. at page 402.

23. Moffett v. Commerce Trust Co., 8 Cir., 187 F.2d 242, 248.

dermined, but a ready means would be at hand to paralyze the entire judicial system.

█ But separate and apart from the legal obstacles to the plaintiff's claim, I am of the view that the motion for summary judgment must also be granted on the alternative ground that there is no genuine issue of material fact. That the complaint is grounded in conspiracy does not preclude the granting of a motion for summary judgment.[24] Nor does the fact that the complaint and the allegations thereunder are to be construed liberally, bar such a motion. A litigant appearing pro se acquires no greater right than any other litigant and such appearance may not be used to deprive defendants of the same rights enjoyed by other defendants. Thus, in Gibson v. Reynolds, 8 Cir., 172 F.2d 95, the Court of Appeals, while acknowledging that allegations of a complaint would not be scrutinized with meticulous nicety on motions to dismiss for insufficiency and the like, nonetheless held:

"But when a litigant contends that the factual allegations of his complaint demonstrate that a group of public officers, presumed to have done their duty, were guilty of such wanton, spiteful, malicious prejudice that their acts, ostensibly done in the performance of their statutory duties, were therefore not acts done 'in relation to or connected with' those duties but were in fact vengeful acts committed for the purpose of personally injuring the litigant, the reviewing court must examine those factual allegations with meticulous care to determine whether such a case is stated. For, as frequently stated by the courts, it is easy for a disgruntled litigant to state his conclusion, and to even believe, that the officer responsible for

the real or imagined injustice was guilty of the rankest kind of malice."[25]

█ Mindful of the admonition of our Court of Appeals that "trial judges should exercise great care in granting motions for summary judgment," [26] I am persuaded, after a careful review of the various affidavits, exhibits and the trial record before the Court of Claims, that there is no genuine issue of material fact.

In addition to the denial contained in the answer, each defendant has filed an affidavit unequivocally denying plaintiff's charges as utterly without foundation. The Trial Judge and each of the Justices of the Appellate Division swears that he determined plaintiff's matter honestly and conscientiously upon the record and the applicable law in accordance with his duty and responsibility as a Justice and that no other consideration motivated his decision. They further swear that prior to their respective determinations they never discussed the case with any person, except that the Appellate Division Justices, following the argument of the appeal, considered the matter in conference.

The Attorney General and the Solicitor General also aver that they did not discuss the matter with any other defendant while plaintiff's case was pending and that they discharged their statutory duty of defending the State's interests against the plaintiff's claim fairly and honestly.

The Trial Judge met the specifications of alleged overt acts not only by his categorical denial but also by a detailed statement and record references demonstrating that they are without substance.

The trial minutes submitted by plaintiff are in accord with the affidavit of the Trial Judge and establish beyond peradventure that plaintiff was given the widest latitude during the course

24. Arnstein v. Porter, 2 Cir., 154 F.2d 464, footnote 17 at page 471; Lindsey v. Leavy, 9 Cir., 149 F.2d 899 (conspiracy); Fishman v. Teter, 7 Cir., 133 F.2d 222 (conspiracy); Dyer v. MacDougall, 2 Cir., 201 F.2d 265 (slander).

25. 172 F.2d at pages 99–100.

26. Doehler Metal Furniture Co. v. United States, 2 Cir., 149 F.2d 130, 135.

of a five-day trial to presen.. her oral and documentary evidence. Indeed, it is apparent that the Trial Court made more than due allowance for the fact that plaintiff appeared as her own counsel. She was permitted to testify in narrative form and as a result much matter, clearly not germane to the issues, was received in evidence without objection. She examined and cross-examined witnesses, including those called by her, almost without restraint. A doctor's newspaper article was received in evidence, as was a letter from an aunt in lieu of testimony. Typical of the lack of substance to plaintiff's claim is the charge that she was denied permission to file a brief. The trial minutes show that not only was such permission granted to her and the Attorney General, but that, in fact, she did file a memorandum of law. A page-by-page reading of the testimony refutes the overt acts asserted in the complaint and demonstrates that the Trial Judge displayed infinite patience in the conduct of the trial.

Plaintiff in resisting the motion filed a thirty-four page affidavit which is devoid of factual matter—at best it is repetitive of her conclusory allegations in the complaint and contains much extraneous matter.

 A party moving for summary judgment bears the burden of showing the absence of any genuine issue of fact requiring a trial.[27] Thereupon, the opposing party must offer countervailing evidence that such an issue does exist[28]—and, of course, if it is present the Court may not grant summary judgment. However, Rule 56 of the Federal Rules of Civil Procedure has not been rendered so sterile[29] that a trial must be granted upon a claim which the papers show has no basis in fact. "The rule should not be used by the court for the trial of disputed questions of fact upon affidavits, but when it is invoked by either party to a case and a showing is made by the movant, the burden rests on the opposite party to show that he has a plausible ground for the maintenance of the cause of action alleged in his complaint, or if a defendant, that he has a ground of defense fairly arguable and of a substantial character."[30]

 Fully recognizing that conspiracies are rarely proved by direct evidence, nonetheless some evidence, however slight, must be offered of a fact from which a reasonably-minded person can draw an inference of the alleged conspiracy.[31] Here, not a scintilla of admissible proof has been submitted by plaintiff to controvert the defendants' affidavits. Rule 56(e) specifically states that "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the mat-

27. 6 Moore's Federal Practice § 56.15[3]; Fairbanks, Morse & Co. v. Consolidated Fisheries Co., 3 Cir., 190 F.2d 817, 824; Walling v. Fairmount Creamery Co., 8 Cir., 139 F.2d 318, 322.

28. Radio City Music Hall Corporation v. United States, 2 Cir., 135 F.2d 715; Orvis v. Brickman, 90 U.S.App.D.C. 266, 196 F.2d 762; Port of Palm Beach District v. Goethals, 5 Cir., 104 F.2d 706.

29. Cf. Millstein v. Leland Hayward, Inc., D.C., 10 F.R.D. 198, 199.

30. Pen-Ken Gas & Oil Corp. v. Warfield Natural Gas Co., 6 Cir., 137 F.2d 871, 877; cf. Engl v. Aetna Life Ins. Co., 2 Cir., 139 F.2d 469, 473; "[M]ere formal denials or general allegations which do not show the facts in detail and with precision are insufficient to prevent the award of summary judgment." See also Piantadosi v. Loew's, Inc., 9 Cir., 137 F.2d 534, cited with approval in the Engl case.

31. Lindsey v. Leavy, 9 Cir., 149 F.2d 899, 901; Whitaker v. Coleman, 5 Cir., 115 F.2d 305, 306: "To proceed to summary judgment it is not sufficient then that the judge may not credit testimony proffered on a tendered issue. It must appear that there is no substantial evidence on it, that is, either that the tendered evidence is in its nature too incredible to be accepted by reasonable minds, or that conceding its truth, it is without legal probative force." cited with approval in Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967. Accord: Dewey v. Clark, 86 U.S. App.D.C. 137, 180 F.2d 766, 771-772.

ters stated therein." The absence of facts is not cured by vituperation and the indiscriminate use of opprobrious adjectives. Neither is it cured by mere assertions unaccompanied by facts which would be admissible in evidence upon a trial.[32]

The test for determining whether summary judgment should be granted is whether at the close of the trial the Judge could properly grant a motion for a directed verdict.[33] If plaintiff took the stand upon a trial and attempted to repeat the statements in her affidavit and complaint, it is all too clear they would be inadmissible and the Court would be required to grant a non-suit.

But the plaintiff insists she is entitled to cross-examine the defendants upon a trial since an issue of credibility is raised by their denial of her charges. She argues that a trier of the fact observing their demeanor may, despite their denials, conclude that "the truth is the opposite of [their] story".[34]

Thus, plaintiff in a typical statement challenges the Appellate Division Justices to answer in open Court "as to how, despite the overwhelming preponderance of evidence before them, they could arrive at their decision unless they were part of the conspiracy to defeat justice." All the other defendants similarly are challenged to justify their actions. However, a trial is required only when there are genuine issues of fact and "the opposing party is not entitled to have the motion denied on the mere hope that at trial he will be able to discredit movant's evidence; he must, at the hearing, be able to point out to the court something indicating the existence of a triable issue of material fact."[35]

In the absence of such an issue, defendants are not required to undergo the expense and vexation of a trial. Of course, every denial in a pleading raises a formal issue—but it does not necessarily raise a genuine issue of fact. "[F]ormalism is not a substitute for the necessity of a real or genuine issue."[36] Rule 56 is intended precisely to permit "a party to pierce the allegations of fact in the pleadings * * * where facts set forth in detail in affidavits, depositions, admissions on file, and other competent extraneous materials show that there are no genuine issues of fact to be tried."[37]

If a mere denial in a pleading, repeated in an affidavit unsupported by any proof, were sufficient to require the credibility of the opposing party to be determined upon a trial, it would make a shambles of Rule 56.

The motion is granted.

Settle order on notice.

---

32. Piantadosi v. Loew's, Inc., 9 Cir., 137 F.2d 534, 536.

33. Dewey v. Clark, 86 U.S.App.D.C. 137, 180 F.2d 766; Arnstein v. Porter, 2 Cir., 154 F.2d 464, 470; Dyer v. Mac-Dougall, 2 Cir., 201 F.2d 265, 268.

34. 201 F.2d at page 269.

35. 6 Moore's Federal Practice, § 56.15[4]; Radio City Music Hall Corporation v. United States, 2 Cir., 135 F.2d 715.

36. Dewey v. Clark, 86 U.S.App.D.C. 137, 180 F.2d 766, 772.

37. 6 Moore's Federal Practice, § 56.15[1].