Howard M. MILLER et al., Plaintiffs,

v.

Winfield H. SCHWEICKART et al., Defendants.

No. 74 Civ. 5089.

United States District Court, S. D. New York.

April 26, 1976.

---

6. Bennett did not claim to have received information from Tomasulo concerning these defendants.

Freeman, Meade, Wasserman & Sharfman, New York City, Laurance V. Good-rich, Brooklyn Heights, N. Y., for plaintiffs; J. Owen Zurhellen, III, Charles I. Poret, New York City, of counsel.

Hays, Landsman & Head, New York City, for defendant Skelly Oil Co.; C. Lansing Hays, Jr., David Ross, New York City, of counsel.

Langberg & Ringel, New York City, for defendant Arthur Rafkind; Nathan Ringel, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Plaintiffs, limited partners of Schweickart & Co. ("Schweickart"), a securities broker-dealer and former member of the New York Stock Exchange, bring this action derivatively on behalf of Schweickart, which suffered a financial collapse in July 1974 and is now defunct. They assert claims against Skelly Oil Company ("Skelly") and others for violations of section 17 of the Securities Act of 1933,[1] section 10(b) of the Securities Exchange Act of 1934,[2] Rule 10b–5 promulgated thereunder,[3] and the New York State common law. The claims center about purchases of millions of dollars of securities by Skelly and others from Schweickart and the latter's commitments to repurchase. In general, the charge is that the transactions were engaged in by Schweickart general partners as part of a conspiracy to defraud Schweickart, and that Skelly and other purchasers of the securities aided and abetted them in concealing the commitment to repurchase. The matter is now before the court on a motion for summary judgment by Skelly, and accordingly we are here concerned only with its role in the alleged conspiracy.

Skelly from time to time accumulates large sums of cash which ultimately are intended for capital purposes, including the acquisition and development of oil and gas properties, improvement and expansion of its refineries and other aspects of its business. Until required for its capital purposes, Skelly's policy is to invest the accu-

1. 15 U.S.C. § 77q.

2. 15 U.S.C. § 78j(b).

3. 17 C.F.R. § 240.10b–5.

mulated funds on a short-term basis by the purchase of federal, state and municipal bonds or notes, certificates of deposit and the like. In August 1971 Skelly's investment officer was solicited by a Schweickart representative (not one of its general partners) with respect to purchases of securities. According to defendant's representatives, undisputed by any Schweickart representative, the oral arrangement which followed the solicitation of the Skelly account was that if Skelly bought bonds from Schweickart, Schweickart would, on a day agreed on, or if no day was agreed on, on whatever day Schweickart or Skelly at their option elected, buy back the bonds at the price at which Skelly purchased them and Skelly would sell the bonds at that price. The plaintiffs refer to these transactions as "parking" of securities, with implied overtones of fraudulent conduct, whereas Skelly refers to them as "repo" or repurchase transactions, which it states are common or normal methods of purchase from banks and sellers of commercial paper. Under the arrangement the purchases of the bonds by Skelly were at a specified price plus interest accrued to the date of purchase; on resale to Schweickart Skelly would receive the price plus interest accrued to the date of resale. Thus Skelly realized the interest which accrued during the period it owned the bond. Pursuant to their arrangement, from September 1, 1971 through February 7, 1972, Skelly bought municipal bonds from Schweickart and from October 1, 1971 through March 27, 1972 Schweickart repurchased the same bonds. Each trade between Skelly and Schweickart was followed by a written confirmation. Whatever nomenclature is applied to these transactions, Schweickart carried the risk of a market decline in the securities, but had the advantage of any market gain.[4]

Plaintiffs' claim is that Schweickart's general partners failed to disclose in Schweickart's records or otherwise the obligation to repurchase from Skelly, thereby enabling them to avoid the capital restrictions of the New York Stock Exchange[5] and exposing Schweickart to extraordinary risks and costs, with consequent financial collapse.

Skelly moves for summary judgment, claiming that any fraud by failure to disclose Schweickart's repurchase obligation was solely that of the Schweickart general partners, and that Skelly's trades with Schweickart, as far as Skelly knew, were ordinary repurchase or "repo" transactions, made without any knowledge by Skelly of their nondisclosure by Schweickart partners or their use to facilitate net capital violations. In the alternative, Skelly urges that even if summary judgment is inappropriate on the issue of *scienter,* the alleged "parking" took place between the fall of 1971 and the spring of 1972 and as a matter of law could not have been a proximate cause of Schweickart's collapse more than two years later in July 1974.

The basic material facts are not in dispute. Solely for the purpose of this motion, Skelly does not dispute that certain Schweickart general partners employed the "repo" transactions with Skelly to overextend Schweickart's capital without detection, and that ultimately Schweickart's fall was due to impairment of its capital facilitated by nondisclosure of oral "repo" commitments with firms other than Skelly. Plaintiffs do not dispute any of the purchase or repurchase transactions. What is in dispute are the inferences to be drawn from the facts. Plaintiffs contend that a permissible inference of Skelly's guilty knowledge arises from the attendant circumstances of these transactions which requires the denial of Skelly's motion and a trial of the issues.

Skelly personnel who participated in the transactions have submitted affidavits categorically denying any knowledge of any

---

4. In fact, upon all the transactions, Schweickart made a profit of $40,483.60 on the sale of bonds it repurchased from Skelly. Although this computation was prepared by a Schweickart representative, plaintiffs' counsel, without any evidentiary support, disputes that it is correct.

5. *See* NYSE Rules 325(a), 327.

wrongdoing or that they were aware of any wrongdoing of any Schweickart partners with respect to the transactions. All orders to purchase or to resell bonds were placed orally by telephone by Skelly personnel who aver that the trades were part of the "daily grist of the mill" of Skelly's investment program for short-term, surplus capital; further, it is stated that the transactions with Schweickart were no different from similar transactions executed with other brokers in connection with Skelly's short-term investment program. No Schweickart representative who handled any of the trades has testified or submitted any affidavit attributing knowledge to Skelly's representative that Schweickart's general partners had failed to disclose or record repurchase obligations and were evading capital restrictions. It is recognized, of course, that Skelly's categorical denials of wrongdoing are by no means conclusive, and by themselves do not require the granting of defendant's motion for summary judgment.[6] The court also recognizes that the absence of direct evidence is not fatal to plaintiffs' claim—indeed it is fully aware that conspiracies are rarely established by direct evidence; that usually they are spelled out by independent circumstantial evidence and the reasonable inferences to be drawn therefrom.[7] However, there must be a fact basis upon which the sought-for inferences of conspiracy and knowing participation therein must rest. Plaintiffs rely upon the fact that the agreements to repurchase were oral; they contend that such agreements are atypical and that this permits an inference by a trier of the fact that Skelly had actual knowledge[8] of the fraudulent use to which the undisclosed transactions were utilized by the Schweickart general partners—in short, plaintiffs argue it warrants a fact-finder to infer that the transactions "had no purpose other than to permit the general partners to exceed capital requirements and to conceal their wrongdoing."[9]

■ A fact-finder may draw reasonable inferences from known or proven facts, but the inference must be based on common experience and be logical or reasonable.[10] Here virtually the single fact relied on to establish that Skelly had guilty knowledge of the illicit purpose of Schweickart's general partners is what plaintiffs term the "suspiciously unusual" nature of the "repo" agreements—that is, the absence of formal written documents evidencing all of the terms.

To support their claim, plaintiffs rely upon the deposition testimony of witnesses. However, upon close analysis the proffered testimony does not support the basic claim. Winfield Schweickart, a defendant and former general partner, testified that his understanding of the term "repo" included transactions where the repurchase agreement was in writing and that he believed oral commitments would not be binding. Jean Golashesky, another general partner, testified she would expect a "repo" transaction to be in writing and her understanding of the term was that it included only written agreements. However, upon cross-examination, she indicated that by "written" she meant only that the various trades would be followed by confirmations.[11] John

---

6. *Cf. Ferguson v. Omnimedia, Inc.,* 469 F.2d 194, 198 (1st Cir. 1972).

7. *Cf. United States v. Kahaner,* 203 F.Supp. 78, 84 (S.D.N.Y.1962); *Morgan v. Sylvester,* 125 F.Supp. 380, 389 (S.D.N.Y.1954), *aff'd,* 220 F.2d 758 (2d Cir.), *cert. denied,* 350 U.S. 867, 76 S.Ct. 112, 100 L.Ed. 768 (1955).

8. Plaintiffs' contention that liability under the federal securities laws can be imposed because Skelly "should have known" of the alleged fraud is without substance. *See Ernst & Ernst v. Hochfelder,* —— U.S. ——, 96 S.Ct. 1375, 47 L.Ed.2d 668, 44 U.S.L.W. 4451 (U.S. March 30, 1976); *Lanza v. Drexel & Co.,* 479 F.2d 1277, 1299–1309 (2d Cir. 1973).

9. Plaintiffs' Rule 9(g) statement at 2.

10. *NLRB v. Gleason,* 534 F.2d 466, at 474, Docket No. 75–4018 (2d Cir. March 3, 1976). *See also Galloway v. United States,* 319 U.S. 372, 395–96, 63 S.Ct. 1077, 1089–90, 87 L.Ed. 1458, 1473 (1943); *Mobile, Jackson & Kansas City R.R. v. Turnipseed,* 219 U.S. 35, 42, 31 S.Ct. 136, 55 L.Ed. 78 (1910).

11. The statement by plaintiffs' counsel that Ms. Golashesky did not fully understand the questions put to her on cross-examination is with-

Stevenson, a bond trader, testified that the usual repurchase agreement was in writing. Finally, another bond trader, Bobby Tanner, stated that the only distinction between a "repo" and a "parking" transaction is that in the latter the commitment to repurchase is "a gentleman's understanding" and in the former there is a written agreement to repurchase at a particular time.

■ A fair reading of the witnesses' testimony suggests that none of them questioned the legitimacy of oral repurchase agreements. Accepting the fact that repurchase agreements are usually written, this does not stamp oral agreements as unusual or illicit. Whether written or oral, the subject matter of the parties' agreement and their respective obligations are the same; that the parties did not commit their understanding to written form did not convert an otherwise legal agreement to an illegal one. Plaintiffs have offered no evidence to indicate that oral repurchase agreements such as these are sinister or usually are used to distort a firm's capital position, or that such transactions are a signal to those in the securities industry that questionable practices are being employed. The fact that the oral agreements were consummated over the telephone by no means establishes that the transactions were without business justification, thereby permitting an inference of guilty knowledge.[12] In short, plaintiffs have tendered nothing of evidential value to support their assertion that oral repurchase agreements are "suspiciously unusual," irregular, atypical or so out of the ordinary as to permit as a reasonable and logical inference knowledge on the part of Skelly that Schweickart's partners, as put by plaintiffs' counsel, "were employing the 'parking' as a device to falsify Schweickart & Co.'s financial position and to engage in bond trading beyond that which its capital would support, thus exposing the firm's capital to unreasonable risk of dissipation should market conditions turn for the worse."[13] It is true that the inference to be drawn from an established fact must be left to the fact finder. But a precondition is that "the inference, to qualify as a fact found, must be reasonable, and, in the context of the known facts, be one that springs readily and logically to mind and . . . not one of two or more inferences, both or all of which are about equally probable."[14] Here the suggested inference, based upon the lack of a written agreement, is so illogical as to preclude its consideration by a jury or fact finder as probative of knowledge by Skelly of Schweickart's partners' fraudulent conduct.

■ Plaintiffs' only other basis for their contention that Skelly was aware of the fraudulent purpose of the transactions is a request sent in early April 1972 to Skelly by Schweickart's auditors asking Skelly to confirm certain of its resales of bonds to Schweickart. Plaintiffs argue that this request constituted "notice to Skelly that the general partners were reporting the 'parking' transactions as unrelated sales and purchases." The argument proceeds that had Schweickart's records reflected the oral repurchase commitments, the auditors would have become aware of them and accordingly would have referred to them in the request for verification. Ergo, plaintiffs contend, the lack of such reference in the request was notice to Skelly that the commitments were concealed from the auditors so that the general partners' fraudulent purpose would be undetected. This strained attempt to impute fraudulent knowledge to Skelly justifying a trial on the issue is groundless. Skelly received the request for verification in early April 1972, by which time it had ceased its purchases from Schweickart—its last purchase of bonds

out substance. His understanding of her state of mind is of no probative value and to the extent there was confusion, if any, his duty was to clarify matters. The record here is clear.

12. *See Woodward v. Metrobank of Dallas,* 522 F.2d 84, 97 (5th Cir. 1975).

13. Plaintiffs' Brief at 4.

14. *National Labor Relations Board v. Gleason,* 534 F.2d 466, at 474, Dkt. No. 75–4018 (2d Cir. March 3, 1976). *Cf. First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 281–84, 88 S.Ct. 1575, 1589–90, 20 L.Ed.2d 569, 587–89 (1968).

subject to a repurchase agreement was on February 7, 1972, some two months before it is urged that Skelly had "clear notice" that the Schweickart partners were concealing the existence of the repurchase commitments. Since plaintiffs seek to ground liability against Skelly on its knowing participation in the fraud, and they do not, as indeed they cannot, contend that Skelly, as an outsider dealing with Schweickart, had any duty of disclosure to Schweickart's investors, Skelly's purported knowledge in April 1972 after it had made its last purchase would not give rise to an actionable claim against it.[15]

■ There is an alternate, and even more compelling basis for the court's holding. Even if it be assumed that Skelly knowingly aided and abetted the fraudulent conduct of the Schweickart general partners during the period of their transactions in 1971 through early 1972, such participation, as a matter of law, was not a proximate cause of Schweickart's collapse in July 1974.

Plaintiffs give the etiology of the collapse as follows: The vice of parking is its use to evade capital restrictions, thereby permitting a firm to engage in trading at a level beyond that which its capital can safely support and exposing that capital to unreasonable and extraordinary risk under adverse market conditions. These conditions in fact prevailed in the bond market in late 1973. Although the "parking" with Skelly had terminated almost a year and a half

before, Schweickart had similar transactions with others during the subsequent period, and under its repurchase agreements was forced to buy bonds back at prices substantially in excess of prevailing market prices. As a result, substantial losses were sustained in those transactions (all unrelated to any dealings with Skelly), with consequent depletion of Schweickart's capital and the firm's final collapse.

As already noted, Skelly's last purchase was made in February 1972 and Schweickart's last repurchase was made on March 27, 1972; thereafter, and through the period of Schweickart's demise, there was no relationship between them. The Skelly transactions were in no sense a direct cause of the disaster. Plaintiffs urge, however, that the concealment of the nature of the Skelly transactions in early 1972 "substantially assisted the general partners to continue their 'parking' *with others* without detection or restraint and thus contributed to the collapse of Schweickart & Co."[16]

■ This far-fetched theory of causation must fail as a matter of law. It is well recognized that recovery under Rule 10b–5 requires that the alleged fraudulent conduct be a proximate cause of plaintiffs' losses.[17] Proximate cause, of course, is a concept borrowed from the law of torts, and generally requires that one's wrongful conduct play a "substantial"[18] or "essential"[19] part in bringing about the damage sustained by another. The considerations that

---

15. Cf. *Schoenbaum v. Firstbrook,* 405 F.2d 215, 219 (2d Cir. 1968), *cert. denied,* 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969); *Jacobs v. Tenney,* 316 F.Supp. 151, 163 (D.Del.1970).

16. Plaintiffs' Brief at 13 (emphasis added).

17. *See, e. g., Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374, 381 (2d Cir. 1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975); *Levine v. Seilon, Inc.,* 439 F.2d 328, 332–33 (2d Cir. 1971); *Globus v. Law Research Serv.,* 418 F.2d 1276, 1291–92 (2d Cir. 1969), *cert. denied,* 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970); *Vine v. Beneficial Fin. Co.,* 374 F.2d 627, 635 (2d Cir.), *cert. denied,* 389

U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967); *Black v. Riker-Maxson Corp.,* 401 F.Supp. 693, 698 (S.D.N.Y.1975); *Tucker v. Arthur Anderson & Co.,* 67 F.R.D. 468 (S.D.N.Y.1975); 6 L. Loss, Securities Regulation 3880–83 (1969). Cf. *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 385, 90 S.Ct. 616, 622, 24 L.Ed.2d 593, 607 (1970).

18. *See, e. g., Globus v. Law Research Serv., Inc., supra.*

19. *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 385, 90 S.Ct. 616, 622, 24 L.Ed.2d 593, 607 (1970).

are important in applying the "substantial" or "essential" factor test, such as lapse of time, the number and impact of other factors and the extent to which the defendant's conduct created a continuous and active potential for harm,[20] all counsel against a finding of proximate cause on these circumstances. Indeed, even if the much more liberal concept of causation were to be applied here, sustaining liability where the defendant's conduct plays any part, "even the slightest,"[21] in bringing about the damage, the claim of causation must fail.

To accept plaintiffs' theory would extend liability for fraud beyond the immediate and foreseeable consequences of one's wrongdoing and in effect make Skelly the permanent accomplice of the Schweickart general partners in all their subsequent parking transactions with others; it would subject Skelly to strict liability for any future depredations by those general partners long after Skelly had ceased to have any dealings with Schweickart, even for deeds done with others years later, of which Skelly had no knowledge. This is causation run riot. As Judge Friendly observed in a different context, "[s]omewhere a point will be reached when courts will agree that the link has become too tenuous."[22] That point has been reached in this case.

While in the usual case proximate cause is a determination to be made by a jury, here the court would not hesitate to direct a verdict for the defendant on the undisputed facts.[23] To allow a jury to find a causal relationship between Skelly's transactions, which terminated in early 1972, and the collapse of Schweickart more than two years later in July 1974, would permit it to engage in sheer speculation of the rankest type.

Plaintiffs press the recent ruling of our Court of Appeals in *Heyman v. Commerce & Indus. Ins. Co.*[24] and kindred cases going back to *Arnstein v. Porter*[25] holding that summary judgment is a "drastic remedy" and that the court's function is not to resolve issues of fact but to determine whether any material factual issues are raised after resolving all ambiguities and questionable inferences in favor of the party against whom summary judgment is sought. But none of those cases impair the vitality and purpose of Rule 56. To the contrary, "summary judgment should not be denied where the only issues raised are frivolous or immaterial ones which would simply serve to provide an exercise in futility or a purposeless trial for the district court . . . ."[26] It is still the rule that "the burden rests on the opposite party to show that he has a plausible ground for the maintenance of the cause of action alleged in his complaint . . . ."[27] Plaintiffs have had extensive pretrial discovery and it is not suggested that other evidence is available to support their claim. Yet no "plausible ground" has been put forward here to warrant a trial. Plaintiffs' theory

---

20. *See* Second Restatement of Torts § 433.

21. *Rogers v. Missouri Pac. R. R.,* 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493, 499 (1957). This standard is applied in certain negligence actions, including those arising under the Federal Employers' Liability Act.

22. *Petition of Kinsman Transit Co.,* 338 F.2d 708, 725 (2d Cir. 1964), *cert. denied,* 380 U.S. 944, 85 S.Ct. 1026, 13 L.Ed.2d 963 (1965).

23. *Cf. Dyer v. MacDougall,* 201 F.2d 265, 267–68 (2d Cir. 1952); *Morgan v. Sylvester,* 125 F.Supp. 380, 390 (S.D.N.Y.1954), *aff'd,* 220 F.2d 758 (2d Cir.), *cert. denied,* 350 U.S. 867, 76 S.Ct. 112, 100 L.Ed. 768 (1955).

24. 524 F.2d 1317 (2d Cir. 1975).

25. 154 F.2d 464 (2d Cir. 1946).

26. *United States v. Matheson,* 532 F.2d 809, 813 (2d Cir. 1976). *See also Williams v. McAllister Bros. Inc.,* 534 F.2d 19, at 21 (2d Cir. 1976).

27. *Morgan v. Sylvester,* 125 F.Supp. 380, 389 (S.D.N.Y.1954), *aff'd,* 220 F.2d 758 (2d Cir.), *cert. denied,* 350 U.S. 867, 76 S.Ct. 112, 100 L.Ed. 768 (1955). *See also Beal v. Lindsay,* 468 F.2d 287, 291 (2d Cir. 1972).

of causation is legally insufficient and the inferences they would draw on the issue of *scienter* lack any reasonable foundation in the record. Absent proof to support plaintiffs' claim, defendant is entitled to protection against the heavy burden and expense of a protracted trial.[28]

The Supreme Court's observation in upholding a dismissal of a complaint charging an antitrust conspiracy is pertinent here:

"While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint."[29]

Accordingly, the motion for summary judgment is granted and the cross-claim of defendant Rafkind against Skelly is dismissed. However, the request for allowance to Skelly of attorneys' fees pursuant to 15 U.S.C., section 77k(e) is denied. There is no indication upon the record that the claims advanced against it were frivolous or brought in bad faith.[30]

---

**28.** *Cf. Morgan v. Sylvester, supra* at 390. *See also Schwartz v. Broadcast Music, Inc.,* 180 F.Supp. 322, 325 (S.D.N.Y.1959).

**29.** *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569, 593 (1968).

**30.** *Cf. Jackson v. Oppenheim,* 533 F.2d 826, 831 (2d Cir. 1976); *Aid Auto Stores, Inc. v. Cannon,* 525 F.2d 468 (2d Cir. 1975).