Arthur SCHWARTZ, Ira Gershwin, John Jacob Loeb, Dorothy Fields, Virgil Thomson, Douglas Stuart Moore, Gian Carlo Menotti, Samuel Barber, Randall Thompson, Milton Ager, Walter Bishop, Paul Cunningham, Mack David, Milton Drake, James Kimball Gannon, L. Wolfe Gilbert, George Graff, Alex Charles Kramer, Jack Lawrence, Alan Jay Lerner, Edgar Leslie, Jerry Livingston, George W. Meyer, Joseph Meyer, Vic Mizzy, Charles Tobias, Leonard Whitcup, Joan Whitney, Donald Macrae Wilhoite, Jr., also known as Don Raye, Jack Yellen, Victor Young, Robert MacGimsey and William Grant Still, individually and on behalf of other writers and composers of musical compositions similarly situated, Plaintiffs,

v.

BROADCAST MUSIC, INC., Radio Corporation of America, National Broadcasting Company, Inc., Columbia Broadcasting System, Inc., Columbia Records, Inc., Columbia Music Publishing Company, Master Records, Inc., Okeh Music Publishing Company, American Broadcasting-Paramount Theatres, Inc., General Teleradio, Inc., Mutual Broadcasting System, Inc., Storer Broadcasting Company, National Association of Radio and Television Broadcasters, BMI Canada, Ltd., Associated Music Publishers, Inc., Allen Intercollegiate Music, Inc., David Sarnoff, Frank M. Folsom, Niles Trammell, William S. Hedges, William S. Paley, Frank Stanton, James B. Conkling, Adrian Murphy, Herbert V. Ackerberg, Raymond Diaz, James E. Allen, J. Harold Ryan, Harold E. Fellows, Carl Haverlin, Justin Miller, Sydney M. Kaye, Merritt E. Tompkins, Robert J. Burton, Glenn Dolberg, Roy Harlow, Harry P. Somerville, Charles A. Wall, John Elmer, J. Herbert Hollister, Leonard Kapner, Paul W. Morency and J. Leonard Reinsch, Defendants.

United States District Court
S. D. New York.
Dec. 7, 1959.

John Schulman, New York City, John Schulman, M. William Krasilovsky, Elsie M. Quinlan, Martin Bressler, New York City, of counsel, for plaintiffs.

Rosenman, Goldmark, Colin & Kaye, New York City, Samuel I. Rosenman, Max Freund, Seymour D. Lewis, Stuart Robinowitz, Herbert H. Blau, Edward M. Cramer, Shirley A. Siegel, New York City, of counsel, for defendants Broadcast Music, Inc., Storer Broadcasting Company, BMI Canada, Ltd., Associated Music Publishers, Inc., Carl Haverlin, Sydney M. Kaye, Merritt E. Tompkins, Robert J. Burton, Glenn Dolberg, Roy Harlow, Harry P. Somerville and Charles A. Wall.

Cravath, Swaine & Moore, New York City, Bruce Bromley, Jack E. Brown, C. Leonard Gordon, New York City, of counsel, for defendants Columbia Broadcasting System, Inc., Columbia Records, Inc., Blackwood Music, Inc. (sued herein as Columbia Music Publishing Company), Master Records, Inc., April Music, Inc. (sued herein as Okeh Music Publishing Company), William S. Paley, Frank Stanton, James B. Conkling, Adrian Murphy, and Herbert V. Akerberg (sued herein as Herbert V. Ackerberg).

Cahill, Gordon, Reindel & Ohl, New York City, Oleg Peter Petroff, New York City, of counsel, for defendants Radio Corporation of America, National Broadcasting Company, Inc., David Sarnoff, Frank M. Folsom, Niles Trammell, and William S. Hedges.

Hawkins, Delafield & Wood, New York City, Clarence Fried, New York City, of counsel, for defendants American Broadcasting-Paramount Theatres, Inc. and Raymond Diaz.

William M. Regan, New York City, of counsel, for defendants General Teleradio, Inc., Mutual Broadcasting System, Inc. and James E. Wallen.

WEINFELD, District Judge.

This is a motion by the defendants for summary judgment in a private antitrust suit brought under sections 4, 12 and 16 of the Clayton Act.[1] The motion is based solely on plaintiffs' alleged lack of standing to sue and hence the merits of the action are not involved.

Alternatively, the defendants seek partial summary judgment, should the Court conclude that plaintiffs are entitled to maintain this action as to some, but not all, of their claims for damages. Finally, the defendants move, should the Court conclude that issues of fact exist as to material matters touching upon plaintiffs' capacity to sue, that a separate trial be granted with respect to such facts.

The plaintiffs urge that the record demonstrates they do have standing to sue, and in any event, disputed questions of fact on this issue require the denial of the motion. As to the request for a separate trial, they contend it would be just as expeditious to proceed on all issues, leaving to the trial court the determination of the defendants' contentions.

The motion, supported by voluminous affidavits and exhibits, is based upon facts which have been culled from pretrial depositions of the plaintiffs and wit-

---

1. 38 Stat. 731, 736, 737 (1914), 15 U.S.C.A. §§ 15, 22, 26.

nesses aggregating more than 20,000 pages of testimony, some 11,000 exhibits consisting of approximately 55,000 pages, and almost 3,000 pages of answers to written interrogatories served pursuant to Rule 33 of the Federal Rules of Civil Procedure.

■ These pre-trial proceedings, which have extended over a five-year period, forecast an extremely long trial presenting complex issues. This circumstance, however, can play no part in the consideration of this motion. If the plaintiffs have been directly damaged by reason of the wrongful conduct charged against the defendants, they may not be denied their day in court, even though a trial upon the merits and incidental proceedings may take, as the defendants suggest, several years. Equally, it follows, if plaintiffs are without right to maintain this action, then the defendants are entitled to be protected against the heavy burden of expense and effort entailed in a protracted and intricate trial. Moreover, the proper administration of justice requires, in the interests of other litigants who await and are entitled to a trial, that the Court's energies and time be not deflected by an unnecessary and time-consuming trial. This comment is made since the extensive, if not prolific, affidavits and briefs submitted in support of, and in opposition to, the motion, have strayed in a number of instances far and wide from the basic question. The allegations of the complaint charging an illegal conspiracy by the defendants in violation of the antitrust laws, must, for the purposes of this motion, be deemed true.[2] Consequently, those portions of the affidavits which argue the merits of the charges are not pertinent.

The issue here falls within a very narrow compass—whether the alleged antitrust conduct of the defendants has injured the plaintiffs in their business or property within the meaning of the antitrust statutes so as to give them standing to maintain this action for treble damages. The voluminous record furnishes a basis upon which a decision can be reached on the question posed. It is difficult to believe that further proliferation of it will yield additional material facts. It is stated that on the limited issue alone thousands of pages of testimony were taken.

The principal documents consisting of the Articles of Association of the American Society of Composers, Authors and Publishers, (hereafter called ASCAP), plaintiffs' agreements with ASCAP and with music publishers, are not in dispute.[3] What is principally in dispute is the interpretation which the parties place upon them and the nature of the relationship between the plaintiffs on the one hand and ASCAP and the publishers on the other. Since the motion rests upon documentary evidence, the authenticity of which is not challenged, plaintiffs' admissions and their answers to interrogatories, there are no facts in dispute which are essential to a determination of the tendered legal question [4]—whether the

2. Safeway Stores, Inc. v. Wilcox, 10 Cir., 1955, 220 F.2d 661; Reynolds v. Maples, 5 Cir., 1954, 214 F.2d 395; Zell v. American Seating Co., 2 Cir., 1943, 138 F.2d 641, reversed on other grounds 1944, 322 U.S. 709, 64 S.Ct. 1053, 88 L.Ed. 1552.

3. In their briefs and upon the argument of the motion, the plaintiffs contended that pre-trial depositions of two witnesses, an ASCAP executive and its General Counsel, had not been completed since they had not cross-examined them. Consequently, they urged that the depositions be disregarded on this motion. The Court was of the view that there was substance to plaintiffs' contention, and to avoid a denial of the motion with leave to renew because of an incomplete record, directed that the examination of the witnesses be completed. Thereafter, the plaintiffs withdrew their objections and consented "that the Court consider and decide the motion upon the record as heretofore presented to it by the parties, including the testimony given by said witnesses as well as the documents produced by said witnesses, which record for this purpose may be deemed sufficient."

4. Cf. Associated Press v. United States, 1945, 326 U.S. 1, 5–6, 65 S.Ct. 1416, 89 L.Ed. 2013.

plaintiffs have standing to maintain this action.

The plaintiffs, thirty-three in number, professional composers and authors, are engaged in the writing of musical compositions.[5] They bring this action, in their individual capacities, and, also, as a spurious class action pursuant to Rule 23(a) (3) of the Federal Rules of Civil Procedure on behalf of approximately 3,000 professional authors and composers of music who allegedly have suffered and will continue to "suffer loss and damage in their business and property" by reason of defendants' conduct in violation of the antitrust laws, as set forth in the complaint. Plaintiffs are members of ASCAP.

The defendants include Broadcast Music, Inc., (hereafter referred to as BMI), which is wholly owned by radio and television broadcasting companies. BMI is engaged primarily in the acquisition and licensing of performance rights in musical compositions. The other defendants include the leading radio and television networks, each of which owns and operates radio and television stations. These defendants, together with other broadcasters, organized BMI. Each broadcasting company defendant is a stockholder of BMI. Also named as defendants are subsidiary publishing and recording companies, and various individuals who were or are officers, directors, or executives of one or more of the corporate defendants.

The gist of the plaintiffs' charges is that the defendants conspired to dominate and control the market for the use and exploitation of musical compositions, particularly the rights to public performance for profit, to establish and maintain a monopoly thereof and to restrain trade and commerce therein. The ultimate goal, say the plaintiffs, was to control the music industry and thereby to fix and reduce the price to be paid by the defendant networks and their co-conspirators in the broadcasting industry for the use of music on their programs.

Plaintiffs charge that to achieve their conspiratorial objective, the defendants organized BMI in 1939, as the vehicle to maintain a music pool for their joint use and benefit, and have dominated it ever since. In general they allege that to effectuate the conspiracy, the defendants have given preference to the performance of BMI controlled music, have discriminated against the musical compositions written by the plaintiffs and other writers similarly situated, have boycotted, restricted and limited their musical compositions both in broadcasting and recording and have induced other broadcasters and record companies to do the same.

Specific acts and conduct of the defendants in furtherance of the conspiracy are enumerated in the complaint. Plaintiffs charge that such conspiratorial acts and conduct have resulted in limited introduction and availability to the public of non-BMI songs and a monopoly in the music industry to the detriment of the plaintiff songwriters, other songwriters and the public. The plaintiffs allege that the defendants have limited, restricted and prevented (1) the publication of musical compositions written by plaintiffs and others similarly situated; (2) the marketing and sale of published versions thereof; (3) the use and utilization thereof by radio and television broadcasting stations and networks; (4) the use and utilization thereof in the manufacture and sale of phonograph records; (5) the public performance for profit thereof in places of public gathering and entertainment, and (6) the stimulation which use and popularization in each of said segments of the market provides for exploitation in other segments thereof.

In consequence, the plaintiffs claim that they and other writers similarly

---

5. Plaintiffs' counsel refers to them as "writers of music"—a "generic term to describe both those who supply the music, commonly called composers, and those who, supplying the lyrics, are called authors." The individual musical works they produce include popular songs, production songs, and serious music including symphonies and music for ballet and opera.

situated have been injured by an annual loss of income from their musical compositions, depreciation of the price of performance fees and loss of prestige and recognition as authors and composers. Plaintiffs seek treble damages in the sum of $150,000,000 and injunctive relief.

[2] Section 4 of the Clayton Act [6] provides in pertinent part, as follows:

"* * * [A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States * * * and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

While the foregoing statute contains no language of limitation, the courts have restricted the right to sue thereunder to those persons who are directly injured in their business or property. Those who are indirectly or incidentally injured by the forbidden conduct have been denied standing to assert a claim.

Our Court of Appeals has summarized the rule as follows:

"Those harmed only incidentally by anti-trust violations have no standing to sue for treble damages; only those at whom the violation is directly aimed, or who have been directly harmed may recover.

* * * * * *

"Undoubtedly, [other] persons suffer some financial loss when anti-

trust violations are directed against the corporations in which they have an interest. But not every financial loss due to an anti-trust violation, however remote, gives a right of action." [7]

Similarly, the rule has been stated in Martens v. Barrett,[8] as follows:

"* * * [I]t is universal that where the business or property allegedly interfered with by forbidden practices is that being done and carried on by a corporation, it is that corporation alone, and not its stockholders (few or many), officers, directors, creditors or licensors, who has a right of recovery, even though in an economic sense real harm may well be sustained as the impact of such wrongful acts bring about reduced earnings, lower salaries, bonuses, injury to general business reputation, or diminution in the value of ownership."

A fairly general pattern has emerged from this concept. The following plaintiffs have been held to be without standing to sue for treble damages under the antitrust laws: (1) a patent owner who licenses his patents to a manufacturer on a royalty basis, for loss of royalties on sales which would have been made but for the antitrust conduct of defendants;[9] (2) shareholders, officers, and creditors of corporations for diminution in value of ownership, loss of earnings or impairment of corporate ability to pay, due to the impact of antitrust conduct on the corporation;[10] (3) nonoperating mo-

6. 38 Stat. 731 (1914), 15 U.S.C.A. § 15. Section 16 of the Clayton Act, 38 Stat. 737 (1914), 15 U.S.C.A. § 26, provides for injunctive relief.

7. Productive Inventions, Inc. v. Trico Products Corp., 2 Cir., 1955, 224 F.2d 678, 679, certiorari denied 1956, 350 U.S. 936, 76 S.Ct. 301, 100 L.Ed. 818.

8. 5 Cir., 1957, 245 F.2d 844, 846.

9. Productive Inventions, Inc. v. Trico Products Corp., 2 Cir., 1955, 224 F.2d 678, certiorari denied 1956, 350 U.S. 936, 76 S.Ct. 301, 100 L.Ed. 818.

10. Bookout v. Schine Chain Theatres, Inc., 2 Cir., 1958, 253 F.2d 292; Martens v. Barrett, 5 Cir., 1957, 245 F.2d 844; Peter v. Western Newspaper Union, 5 Cir., 1953, 200 F.2d 867; Loeb v. Eastman Kodak Co., 3 Cir., 1910, 183 F. 704; Westmoreland Asbestos Co. v. Johns-Manville Corp., D.C.S.D.N.Y.1939, 30 F. Supp. 389, affirmed per curiam 2 Cir., 1940, 113 F.2d 114; Walder v. Paramount Publix Corp., D.C.S.D.N.Y.1955, 132 F.Supp. 912; Gerli v. Silk Ass'n, D.C. S.D.N.Y.1929, 36 F.2d 959.

tion picture landlords for depreciation in market value of the property or loss of rents attributable to antitrust violations relating to the showing of pictures at the theatres operated by their lessees;[11] (4) an insurance broker for loss of income due to a conspiracy to deprive the company which he represented of a particular contract;[12] (5) a supplier of raw materials for loss of sales resulting from conduct restricting the business of its major customer.[13] While the instant case bears resemblance to some of the foregoing, it does not fit precisely the pattern of any.

The defendants' position broadly stated is that the pre-trial record demonstrates that the plaintiffs have so divested themselves to others—ASCAP and music publishers—of rights in their compositions, that they retained no "business or property" susceptible of direct injury within the meaning of the statute; that the conspiracy to restrict compositions written by the plaintiffs, if it injures anyone, directly injures ASCAP and the publishers, and injury, if any, to plaintiffs is indirect, remote and incidental, for which recovery is not permitted under the act.

Consideration of this contention requires an analysis of plaintiffs' rights in their musical compositions, the nature of the rights transferred to others and what rights, if any, were retained by plaintiffs.

■■ A writer of a musical composition under common law possesses the exclusive right to make the first publication and to prevent publication by others. However, upon its first publication the composition passes into the public domain. The author's right in his composition may be preserved by publication with notice of copyright in compliance with the terms and provisions of the Copyright Act.[14] Upon such publication the common law rights are terminated and statutory rights come into being and control.[15] As stated in some of the authorities, "when the copyright comes in, the common law right goes out."[16] The statutory rights may be summarized as follows:

(1) *Printing and publishing rights:*

The right to print and sell piano and orchestration copies, folios, composite works and other printed versions of the composition;

(2) *Mechanical reproduction rights:*

(a) The right to manufacture and sell phonograph recordings, electrical transcriptions, tapes and other devices reproducing the composition, including (b) the right to make recordings of the composi-

---

11. Melrose Realty Co. v. Loew's, Inc., 3 Cir., 234 F.2d 518, certiorari denied 1956, 352 U.S. 890, 77 S.Ct. 128, 1 L.Ed. 2d 85; Harrison v. Paramount Pictures, Inc., D.C.E.D.Pa.1953, 115 F.Supp. 312, affirmed per curiam 3 Cir., 211 F.2d 405, certiorari denied 1954, 348 U.S. 828, 75 S.Ct. 45, 99 L.Ed. 653; Westmoreland Asbestos Co. v. Johns-Manville Corp., D.C.S.D.N.Y.1939, 30 F.Supp. 389, affirmed per curiam 2 Cir., 1940, 113 F. 2d 114. The Third Circuit so held in Melrose and Harrison in spite of the fact that the lessees allegedly participated in the antitrust conduct. The Seventh Circuit declined to follow these cases and in Congress Building Corp. v. Loew's, Inc., 7 Cir., 1957, 246 F.2d 587, held that a nonoperating theatre owner-lessor did have standing to sue where the lessee was a co-conspirator or a participant in the practices complained of.

12. Miley v. John Hancock Mut. Life Ins. Co., D.C.D.Mass., 148 F.Supp. 299, affirmed per curiam 1 Cir., 242 F.2d 758, certiorari denied 1957, 355 U.S. 828, 78 S.Ct. 38, 2 L.Ed.2d 41.

13. Snow Crest Beverages, Inc. v. Recipe Foods, Inc., D.C.D.Mass.1956, 147 F. Supp. 907.

14. 17 U.S.C.A. § 10.

15. Bobbs-Merrill Co. v. Straus, 1908, 210 U.S. 339, 347, 28 S.Ct. 722, 52 L.Ed. 1086; Warner Bros. Pictures, Inc. v. Columbia Broadcasting System, Inc., 9 Cir., 1954, 216 F.2d 945, certiorari denied 1955, 348 U.S. 971, 75 S.Ct. 532, 99 L. Ed. 756.

16. E. g., Warner Bros. Pictures, Inc. v. Columbia Broadcasting System, Inc., 9 Cir., 1954, 216 F.2d 945, 948, certiorari denied 1955, 348 U.S. 971, 75 S.Ct. 532, 99 L.Ed. 756.

tion in synchronization with motion pictures;

(3) *Public performance for profit rights:*

The right to perform, nondramatically, the composition in public for profit by means of live or recorded presentations.[17]

The rights so granted upon compliance with the statute are separate and independent. They may be retained by the owner or disposed of by him to others either singly or in their entirety, as his interests dictate.[18]

The burden of the defendants' challenge to the plaintiffs' standing to sue centers about the separate dispositions by plaintiffs of (1) printing, publishing and mechanical reproduction rights, sometimes referred to hereafter as the publishing and recording rights, and (2) the nondramatic public performance rights for profit, hereafter referred to as the public performance rights. The claims which center about these rights may be considered separately.[19]

To support their position, the defendants note that the complaint alleges, and the pre-trial record establishes, that plaintiffs' and other writers' compositions are marketed through (1) the printing and sale of sheet music, (2) the licensing of recordings on phonograph records and other mechanical reproductions, and (3) the licensing of public performance rights. Accordingly, the defendants argue that since the plaintiffs have granted, for commercial exploitation, their public performance rights to ASCAP and their recording and publishing rights to the publishers, from whom they receive payments therefor, any injury to plain-tiffs is indirect and secondary; that the conspiracy, if it injures anyone directly, injures ASCAP and the music publishers; that the right to sue for damages for such direct injuries is with them and not with the plaintiffs.

In all, 7,000 songs have been composed by the plaintiffs herein.[20] As to all, the public performance rights are the subject of agreements with ASCAP by virtue of plaintiffs' membership therein.

As to 5,800 of the total number, the publishing and recording rights are the subject of agreements entered into by plaintiffs with publishers.

As to the remaining 1,200, no publishing or recording contracts are in effect. The plaintiffs are the common law or statutory copyright owners.

### The Nondramatic Public Performance Rights and ASCAP

The complaint emphasizes that a principal objective of the conspiracy was control of the public performance rights in musical compositions. Hence, we turn first to this aspect of the defendants' attack upon plaintiffs' standing to sue. This involves a consideration of ASCAP and the agreement under which it licenses the nondramatic public performance for profit of plaintiffs' compositions.

ASCAP is a nonprofit unincorporated association which was formed in 1914 to protect its members against piracies of their works and generally to promote their interests. It grants licenses and collects royalties for the nondramatic public performance for profit of the works of its members.[21] Its duration is 99 years. Its membership includes two

---

17. The statute also grants to an author a public performance right in dramatico-musical works. Neither this right nor the motion picture synchronization rights are involved herein.

18. Interstate Hotel Co. v. Remick Music Corp., 8 Cir., 1946, 157 F.2d 744, 745, certiorari denied 1947, 329 U.S. 809, 67 S.Ct. 622, 623, 91 L.Ed. 691; M. Witmark & Sons v. Jensen, D.C.D.Minn.1948, 80 F.Supp. 843, 846–847, appeal dismissed 8 Cir., 1949, 177 F.2d 515.

19. Cf. Ring v. Spina, 2 Cir., 1945, 148 F.2d 647, 653, 160 A.L.R. 371.

20. This was the total number which at the time of plaintiffs' last examination had been published, placed with a publisher, or registered with ASCAP for performance credits. It does not include works written thereafter.

21. ASCAP also licenses other compositions in its repertory, obtained by contract with foreign societies.

groups, authors and composers of music, referred to as "writer members", and music publishers. The writer members, including plaintiffs, number in excess of 3,000. ASCAP's general management is vested in a Board of Directors which since prior to 1941 has consisted of an equal number of writer and publisher members. Under the Articles of Association, all members, writers and publishers alike, execute agreements vesting in ASCAP the right to license, upon a nonexclusive basis, the nondramatic public performance of works written or published by the members. Pursuant thereto, these plaintiffs, writer members, entered into uniform agreements with ASCAP. The agreements provide in part that: "The Owner [the publisher or writer member] sells, assigns, transfers and sets over unto [ASCAP] for the term hereof, the entire exclusive [22] right of public performance * * * in each musical work," of which he is the copyright owner either alone or jointly with others, or in which he has any right, title or interest, or which during the term of the agreement may be written, composed, acquired, owned, published or copyrighted by the owner, alone, jointly, or in collaboration with others. The agreement further provides that with respect to every such musical work, the right of public performance "shall be deemed assigned to [ASCAP] by this instrument and shall vest in and be the absolute property of [ASCAP] for the term hereof * * *." These agreements cover substantially all the 7,000 compositions written by the respective plaintiffs. They expire December 31, 1965.

ASCAP, through its licensing department, grants performance licenses to users of music. They are of two kinds: (1) a blanket license, and (2) a program license. The blanket license is the type generally issued. It grants to the music user for its term the right to perform all the music in ASCAP's catalogue upon payment of a flat fee which does not vary according to the number of ASCAP compositions used by the licensee or the number of programs in which they are played. Under the program license the broadcaster pays ASCAP a fee only for each program in which ASCAP's music is used. The terms of the licenses and the rates to be charged are decided by ASCAP's Board of Directors. Individual members do not pass upon, approve, ratify or reject license terms agreed to by the Board.

All royalties and license fees collected by ASCAP are pooled in a common fund. Control over and disposition of all funds received is vested in the Board of Directors. The funds are first disbursed to meet operating expenses and payments due to affiliated foreign societies. Upon payment of the foregoing plus reserves which may be set up, the net amount remaining is distributed among the members upon order of the Board of Directors. The amount to be distributed is divided into two equal parts: one for allocation among publisher members and the other for allocation among writer members.[23] The royalties payable to individual writer members are determined by a Writers' Classification Committee composed of writer members of the Board of Directors. The Committee is empowered to determine a writer's status with respect to his share of royalties. In fixing the status of a member, certain criteria are imposed by the Articles of Association upon the Committee.[24] These include the number, nature, character and prestige of works composed, written or published by the member, the length of

22. Despite this provision, ASCAP only has a nonexclusive right to license such performances. A provision in a consent decree entered in 1941 (United States v. ASCAP, Civ. No. 13–95, S.D.N.Y., Mar. 4, 1941) enjoined ASCAP from acquiring or asserting exclusive performance rights in the compositions. Thereafter, a clause was added at the end of the agreements stating that the grant made by the owner was modified by the consent decree. Following the entry of an amended decree in 1950 the word "exclusive" was omitted from the agreements.

23. Articles of Association of ASCAP, Article XV.

24. Id. Article XIV.

time his works have been a part of the ASCAP catalogue, their popularity and vogue. Primary consideration is to be given to the performance of the compositions as indicated by objective surveys. The system of distribution used by the Writers' Classification Committee has been changed from time to time.

With respect to the 7,000 songs, public performance licenses have been granted only by ASCAP. Plaintiff members since 1941 have not granted a single license although they assert an equal right to grant nonexclusive licenses, a point hereafter considered.

The defendants emphasize that the terms of plaintiffs' membership in ASCAP plus ASCAP's activities in marketing for public performance the works of the plaintiffs and other writers compel a finding that it is not the plaintiffs but ASCAP which is in the business of licensing the compositions. Accordingly, they urge that the force of the defendants' alleged illegal conduct is visited directly, and in the first instance, upon ASCAP which receives all the licensing fees and only indirectly upon plaintiffs in the form of reduced royalties.

Plaintiffs, however, contend that their business is not only that of creating and writing songs and compositions, but also includes exploiting and promoting their songs; that ASCAP is simply the vehicle through which they effect public distribution of their products. They urge that ASCAP is only an agent, "the middleman between the songwriter and the user"—that they "utilize the services of ASCAP as a licensing and collection agency." Plaintiffs also refer to it as a

"co-operative society" and as "a conduit through which the fees flow from the users to the members themselves." Consequently, they contend, the direct loss falls upon them and not ASCAP.

No purpose is served in attempting to define the precise jural nature of ASCAP whether "co-operative society," "agent," "conduit," [25] or "middle-man," as plaintiffs variously contend or, as the defendants contend, "a corporate-like entity" or an association whose entire membership has a "joint and common interest" in this action similar to the members of a partnership. Theoretical concepts must give way to reality.

The stubborn facts are that the plaintiffs under the Articles of Association by which they are bound [26] have executed agreements which unequivocally transfer to ASCAP a nonexclusive right to license public performances for profit of their compositions; that it is ASCAP, and ASCAP alone, which has marketed and licensed the 7,000 songs written by plaintiffs; that it was not the plaintiffs but ASCAP which negotiated the prices and terms of the licenses; that it was not the plaintiffs but ASCAP which prosecuted claims of infringement of plaintiffs' compositions. It is ASCAP and not its licensees from which the plaintiffs and their fellow members receive royalties. It is ASCAP which determines how much each composer shall receive. The amount distributable to a plaintiff of his share of the fund is beyond his control. Thus, even were it accepted that ASCAP is a "co-operative society" which renders services exclusively in the interests of its members, this would "not remove its ac-

---

25. Our Court of Appeals has recognized that ASCAP is not a mere agency or conduit for its members. Reversing a District Court ruling which dismissed an action brought by two publisher members (corporations) and ASCAP for infringement of copyright, the Court stated "any recovery of damages * * * would go to the society, and the corporate plaintiffs were necessary parties merely because they hold their respective causes of action in trust for the society." Buck v.

Elm Lodge, Inc., 2 Cir., 1936, 83 F.2d 201, 202. There are many cases where the vindication of the right of public performance of members' songs was brought in the name of ASCAP, e. g., Buck v. Jewell-La Salle Realty Co., 1931, 283 U.S. 191, 51 S.Ct. 410, 75 L.Ed. 971; Jewell-La Salle Realty Co. v. Buck, 1931, 283 U.S. 202, 51 S.Ct. 407, 75 L.Ed. 978.

26. Gem Music Corp. v. Taylor, 1945, 294 N.Y. 34, 38, 60 N.E.2d 196, 198.

tivities from the sphere of business." [27] Its business nature is not affected by its nonprofit character.[28]

The thrust of the alleged conspiracy insofar as the public performance rights are concerned is directed against ASCAP as the licensor of the totality of all its members' compositions and not as against particular members or particular compositions. The licensing activities of ASCAP are extensive and represent a vast business enterprise. It has licensed 3,475 radio stations; 21 national and regional radio networks; 453 television stations and 3 television networks. In 1955,[29] 85 per cent of all radio performances and 90 per cent of all television performances of copyrighted music were licensed by ASCAP. In a single year it has issued more than 26,000 general licenses to hotels, night clubs, restaurants and similar public places, motion picture theatres, drive-ins, wired music operators and others. In 1956, its receipts from licenses were close to $25,000,000 and after required disbursements it distributed almost $19,000,000 to its members. No matter what name may be applied to ASCAP, no matter what its jural character, as a consequence of the grant of rights by its members to it, the competition in the field of nondramatic public performances for profit is between ASCAP and BMI and not between plaintiffs or other composers and BMI. Indeed, plaintiffs themselves virtually concede this. In answer to an interrogatory they stated: " * * * The rights of public performance for profit of the musical compositions written by [plaintiffs and other writers similarly situated], except in rare instances, are cleared through ASCAP or defendant BMI." No matter how phrased, it cannot obscure.

the fact that ASCAP, and not the individual composers, is the direct target of the alleged conspiracy. Any other conclusion flies in the face of reality.

■ The situation here presented comes within the doctrine enunciated by Judge Learned Hand in Bookout v. Schine Chain Theatres, Inc., 2 Cir., 1958, 253 F.2d 292, 295, that "all claims under the Anti-Trust Acts rest upon wrongs done by the suppression of competition and must be initiated by a party whose commerce has been directly injured."

The conclusion is compelled that in practice and in fact it is ASCAP which was and is engaged in the business of licensing plaintiffs' compositions for public performance; that for that purpose plaintiffs have so divested themselves of their public performance rights to ASCAP that any injury resulting from the conspiracy was primarily and directly upon ASCAP; that injury if any, sustained by the plaintiffs is secondary and remote.

■ The plaintiffs seek to avert this conclusion, relying upon certain retained rights with respect to their compositions, which independently of those granted to ASCAP, they claim are susceptible of direct injury by reason of defendants' conduct.

First, the fact that plaintiffs retained a separate right to grant nonexclusive licenses (assuming *arguendo* that the right remained with the plaintiffs)[30] does not alter the remote nature of any claimed injury. While the 1941 decree voided the exclusive licensing right in ASCAP, the fact is, as already noted, that no plaintiff granted nondramatic public performance licenses.[31] The rea-

27. American Medical Ass'n v. United States, 1943, 317 U.S. 519, 528, 63 S.Ct. 326, 87 L.Ed. 434.

28. Cf. Associated Press v. National Labor Relations Board, 1937, 301 U.S. 103, 128–129, 57 S.Ct. 650, 81 L.Ed. 953.

29. The last year for which records were presented.

30. The defendants dispute that the plaintiffs still retain this nonexclusive right in view of their contracts with the publishers which granted them "all rights" in the compositions not granted to ASCAP. In view of the disposition here made it is unnecessary to decide this issue.

31. While plaintiff Schwartz in his affidavit suggests that some of the composers

son is apparent. The blanket licenses issued by ASCAP permit the performance of all compositions in ASCAP's repertoire and hence there is no need for a user to obtain a license from any individual ASCAP member to perform that member's particular composition. The nonexclusive right allegedly retained by the plaintiffs is more apparent than real. The only loss plaintiffs could have suffered was loss of income from ASCAP.

As to the right to restrict nondramatic performances by ASCAP's radio and television licensees, this has rarely been exercised. Its purpose is to enable an author to protect his composition against indiscriminate performances. This hardly gives support to a claim of direct injury.

As to plaintiffs' contention that they retained rights concerning the use of said compositions in dramatico-musical settings, the complaint does not allege, nor is evidence presented, that the conspiracy was directed toward these rights, and hence this furnishes no basis for holding that plaintiffs have standing to sue.

Neither does the right to resign from ASCAP give the plaintiffs standing to sue for alleged diminution of income received from ASCAP during the period of membership. Plaintiffs in fact have not resigned. Even if they did, while it would terminate all existing assignments, the resignation would be subject to any right or obligation existing between ASCAP and its licensees and further, to the withdrawing members' right to a proportionate share of distributions from royalties accruing under existing licenses. ASCAP would continue to have the right to grant nonexclusive licenses in a resigned writer's composition as long

as his publishers and collaborators remained members of ASCAP.[32]

The rights retained by plaintiffs, whether they be called rights of reversion, recapture, restriction, resignation or otherwise, upon this record are not of such a nature that they are susceptible of direct damage or support a claim of direct injury under the charged conspiracy. The hard fact that will not down is that, despite these retained rights, plaintiffs have not, during the period of the conspiracy, licensed public performances of their compositions. ASCAP and ASCAP alone performed that function. There is no showing that the plaintiffs intended to exercise these rights for the purpose of licensing their songs for public performance,[33] or that the defendants did anything to interfere with plaintiffs' exercise of them. Injury to them, if any, was not only remote but the fact remains that the primary impact and injury was upon ASCAP as the licensor of its members' songs and the recipient of the fees therefor.

Finally, plaintiffs stress their promotional activities to popularize their songs to derive greater income and urge this as constituting part of their business which they say has been injured by the defendants' conduct. They refer to individual efforts to induce orchestra leaders, performers, disc jockeys, and others, to play their songs as well as efforts to interest record companies in recording 'them. But these various activities are no different from those engaged in by an author attending a book luncheon, lecturing before college and other groups, or appearing on radio and television programs. The activities of a composer, even though the end result may mean increase in sales

granted consents to users of music, his answers to interrogatories categorically state: "The licenses for nondramatic performance for profit for all compositions noted in Schedule A have, since 1940, been issued by ASCAP." It appears that the very limited consents referred to were not for nondramatic performances but were rather consents to perform songs on ASCAP's restricted list or consents to make dramatic performances. At best they are *de minimis*.

32. Broadcast Music, Inc. v. Taylor, Sup. Ct., N.Y.Co.1945, 10 Misc.2d 9, 55 N.Y.S. 2d 94.

33. Cf. Triangle Conduit & Cable Co. v. National Electric Products Corp., 3 Cir., 1945, 152 F.2d 398, 399; American Banana Co. v. United Fruit Co., 2 Cir., 1908, 166 F. 261, affirmed 1909, 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826.

of sheet music or records of his composition, do not mean he is in the business of promoting his songs any more than an author of a book is in the business of publishing simply because he seeks by promotional action to increase the sales of his books.

In the instant case, unlike others where a plaintiff who was held to be indirectly damaged was denied a right to sue, an avenue of relief is open to the plaintiffs and all other members of ASCAP on whose behalf they allege they bring this action. No substantial reason has been advanced why ASCAP has not brought the action or why it has not been vouched into the action. The fact that ASCAP is a nonprofit organization does not mean that direct injury cannot be inflicted upon it by illegal antitrust conduct of others, just as that fact does not mean that ASCAP cannot itself indulge in antitrust conduct.[34] The fact is that ASCAP has sued and has been sued. Indeed, were ASCAP to bring an action based upon the alleged illegal conduct of the defendants by reason of claimed injury and recover a judgment, the proceeds in the first instance would be the property of the association, and subject to the payment of its debts. A recovery would permit distribution to be made to the individual plaintiffs and other members of ASCAP as determined by the Writers' Classification Committee in accordance with the by-laws.[35]

Upon all the foregoing, the Court holds that with respect to the nondramatic public performance rights, the plaintiffs are without standing to sue.

We now consider whether the plaintiffs have standing to sue with respect to publishing and recording rights.

### The Publishing and Recording Rights and the Publishers

The plaintiffs have entered into agreements with 300 music publishers, who are also members of ASCAP. Under these they have transferred to the publishers their unpublished original compositions with the right to secure copyright therein and all rights thereunder, subject to the performance rights granted to ASCAP. The agreements cover approximately 5,800 of the 7,000 compositions written by the plaintiffs. They are substantially similar and provide:

"The Writer hereby sells, assigns, transfers and delivers to the Publisher a certain heretofore unpublished original musical composition written and/or composed by the above-named Writer now entitled * * * including the title, words and music thereof, and the right to secure copyright therein throughout the entire world, to have and to hold the said copyright and all rights of whatsoever nature thereunder existing * * *."

The agreement further provides for the payment by the publisher to the writer of stipulated royalties based upon the number of copies of sheet music sold, and a percentage of gross sums received from recording licenses. There can be no doubt that the essential marketing and exploitation of the publishing and recording rights has been carried on under the contracts by the plaintiffs' publishers; that plaintiffs themselves, with but rare exceptions, have never granted any license pertaining to any right in such compositions; that it is the publishers who are in the business of publishing and issuing licenses for recordings and other

---

34. American Medical Ass'n v. United States, 1943, 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434.

35. Cf. American Cooperative Serum Ass'n v. Anchor Serum Co., 7 Cir., 153 F.2d 907, 912–913, certiorari denied 1946, 329 U.S. 721, 67 S.Ct. 57, 91 L.Ed. 625. What was said in Loeb v. Eastman Kodak Co., 3 Cir., 1910, 183 F. 704, 709, although the reference was to stockholders of a corporation is equally pertinent here:

"Certainly it is not apparent that the [antitrust act] was intended to or did confer upon hundreds or thousands of stockholders individual rights of action when their wrongs could have been equally well and far more economically redressed by a single suit in the name of the corporation."

mechanical reproductions of the plaintiffs' compositions.

Again the defendants stress that it is the publishers who in the first instance receive the income from the sale of sheet music and the licensing of recordings upon which royalty payments to the plaintiffs are based. Thus, insofar as the complaint charges interference with the exploitation of the publishing and recording rights in plaintiffs' songs, the case at first blush would seem to compel the same conclusion as that reached in the instance of ASCAP.[36] Notwithstanding, plaintiffs, aside from questioning their precise relationship with their publishers,[37] here urge that other factors are present which give them standing to sue.

The plaintiffs have offered testimony on their pre-trial examinations and in their affidavits in opposition to this motion with respect to various practices allegedly engaged in by the defendants in furtherance of the conspiratorial objective.

They charge that music publishers with whom they had contracts were induced by subsidies, restrictive covenants, incentive payments and other devices including payments of salaries of publishers' employees, to refrain from publishing and exploiting plaintiffs' songs; that recording companies were induced by various methods not to record plaintiffs' songs; that these activities were all for the purpose of suppressing plaintiffs' musical compositions altogether or to discriminate in favor of BMI songs. Plaintiffs further allege that some publishers, who were ASCAP houses, organized BMI companies and although in theory functioning separately, in fact, because of special concessions granted by BMI to the publishers, refrained from promoting non-BMI music or curtailed its exploitation. Plaintiffs name firms who engaged in this practice.

Publishers to whom plaintiffs transferred their compositions with the right to secure the copyrights were obligated to exploit them in good faith for the benefit of the composers, as well as for themselves.[38]

The essence of these charges is that the defendants, in furtherance of the alleged conspiratorial objective to control the music market, induced publishers, including some under contract to plaintiffs, by various means, to withhold exploitation and marketing of plaintiffs' compositions in printed and recorded form; that in order to induce the publishers to do so, the defendants made payments to the publishers to cover their loss in income by reason of nonexploitation of plaintiffs' songs, thus making them whole to the detriment of the plaintiffs; that by such payments, defendants removed the incentive for, and interfered with the duty upon, the publishers to promote the marketing of plaintiffs' songs.

The Court's function on this motion is not to weigh and pass upon the merits of the charges. Should the proof sustain the charges, it would be difficult to challenge plaintiffs' claim of direct injury. This branch of the conspiracy appears, upon the facts alleged, to be directed not against the publishers but rather against the songwriters. A conspiracy may have more than one objective and its force directed against one or more intended victims. The target area of the conspiracy was broad enough to include

36. The defendants point out that the rights given to the publishers are not burdened with the same reserved rights as in the instance of ASCAP.

37. Plaintiffs contend that their contractual relationship with the publishers is a profit-sharing arrangement. The courts, however, appear to have held otherwise, and term the relationship as one of *debtor* and *creditor*. Steinbeck v. Gerosa, 4 N.Y.2d 302, 317, 175 N.Y.S.2d 1, 151 N.E.2d 170, 178, appeal dismissed, 1958, 358 U.S. 39, 79 S.Ct. 64, 3 L.Ed. 2d 45. See also, Ring v. Spina, 2 Cir., 1945, 148 F.2d 647, 652, 160 A.L.R. 371. Plaintiffs also claim that their agreement with the publisher is "a personal service arrangement."

38. Broadcast Music, Inc. v. Taylor, Sup. Ct., N.Y.Co.1945, 10 Misc.2d 9, 21, 55 N.Y.S.2d 94, 104; In re Waterson, Berlin & Snyder Co., 2 Cir., 1931, 48 F.2d 704.

plaintiffs insofar as the publication and recording rights are concerned.[39] Upon the facts alleged, the publishers were not damaged since they received compensating payments from the defendants; the only persons damaged were the song-writers. The wrongful acts had a direct impact upon the composers who were injured thereby and not upon the publishers who were made whole. The bounties granted to the publishers removed them from the target area of the defendants' attack and placed plaintiffs directly in the line of fire. We note particularly the comment of the Court of Appeals in Productive Inventions, Inc. v. Trico Products Corp.: [40]

"No hard and fast rule can be laid down in these situations as the line between direct and incidental damage is not always definable with clarity."

The fact that the plaintiffs divested themselves of the publishing and recording rights does not deprive them of standing to sue. They could receive royalties only if the publishers, in good faith, worked their compositions. Here the charge is that the very function which the publishers undertook to perform had been interfered with and rendered sterile by the acts of the defendants.

The significant distinction in the ASCAP situation is that no claim is made that ASCAP participated in or lent itself to any conduct in violation of its duty to market plaintiffs' compositions, which resulted in diminution of income to the plaintiffs. On the contrary, as already noted, the force of the conspiracy was directed against ASCAP as the licensor of its entire catalogue of songs.

The instant situation is also readily distinguishable upon the facts from the cases relied upon by the defendants. It is more nearly akin to the case of a landlord who is permitted to maintain a suit for damages where his lessee is charged with being a co-conspirator or a participant with the defendants in the wrongful conduct which led to a diminution of the landlord's income. While here it is not charged that the music publishers were co-conspirators, sufficient has been alleged to indicate that the defendants in effect used ready and complaisant music publishers to deprive plaintiffs of a market with respect to the publishing and recording of their compositions.

Under all the circumstances presented, plaintiffs have set forth enough to support their claim of direct injury due to the acts and conduct charged against the defendants so as to entitle them to maintain this claim. Accordingly, this aspect of the defendants' motion is denied.

### Plaintiffs' 1200 Songs as to Which No Publisher Contracts Are in Effect

There remains for final consideration the defendants' contention with respect to the 1,200 songs as to which no publisher contracts are in effect. These constitute works of which the respective plaintiffs were either a registered proprietor of statutory copyright, a holder of legal title to common law copyright, or are compositions in which a publisher's right has terminated because of cancellation of the contract. The interest of plaintiffs therein was susceptible to damage by the charged conspiracy. Here the plaintiffs claim the publishing and recording market was entirely foreclosed to them by reason of defendants' action. While defendants acknowledge that plaintiffs are the common law or statutory copyright owners of these compositions, they minimize their value and contend that any injury was only collateral and any damage inconsequential. This contention is without substance. Whether the damage is great or slight is a question of fact to be decided by the trier of the fact. Accordingly, the defendants' motion likewise is denied with respect to the 1,200 songs.

Settle order on notice in accordance with the foregoing.

**39.** Cf. Karseal Corp. v. Richfield Oil Corp., 9 Cir., 1955, 221 F.2d 358.

**40.** 2 Cir., 1955, 224 F.2d 678, 680, certiorari denied 1956, 350 U.S. 936, 76 S.Ct. 301, 100 L.Ed. 818.