Joel KRONFELD, Plaintiff,

v.

TRANS WORLD AIRLINES, INC. and Trans World Corporation, Defendants.

No. 83 Civ. 8641 (EW).

United States District Court, S.D. New York.

March 31, 1986.

Pomerantz, Levy, Haudek, Block & Grossman, Harvey Greenfield, New York City, for plaintiff; Stanley M. Grossman,

Bruce G. Stumpf, Shaheen Rushd, of counsel.

Hughes, Hubbard & Reed, New York City, for defendants; Robert J. Sisk, Norman C. Kleinberg, Rebecca Northey, Janice B. Stanton, Bradley J. Andreozzi, of counsel.

EDWARD WEINFELD, District Judge.

Plaintiff, suing on behalf of a class of purchasers of securities of Trans World Airlines ("TWA" or "the Airline"), alleges violations of § 10(b) of the Securities Exchange Act of 1934[1] and § 11 of the Securities Act of 1933.[2] Plaintiff alleges that the July 29, 1983 prospectus by which TWA offered a new issue of convertible preferred stock failed to disclose that TWA's parent company, defendant Trans World Corporation ("TWC" or "Trans World"), was considering a "spinoff" transaction in which TWA would be separated from TWC. Defendants move for summary judgment. The motion must be considered against the background of events which preceded and led to the spinoff of TWA from TWC.

In late 1982 and early 1983 Odyssey Partners ("Odyssey"), a private investment partnership with holdings in TWC securities, approached TWC's management with a proposal to "disaggregate" TWC's corporate holdings, which included, along with TWA, Hilton International Hotels, Century 21 Real Estate, Spartan Corporation, and Canteen Corporation. After initial private discussions between the Odyssey group and TWC management, Odyssey solicited shareholder proxies for a proposal requesting TWC's Board to study and report to the shareholders on the possibility of establishing TWC's subsidiaries as independent corporations.[3] In support of its proxy solicitation, Odyssey argued that the securities of the disaggregated subsidiaries would trade at a net premium over the trading value of TWC stock, in large part because, in Odyssey's view, the poor financial performance of TWA was adversely affecting the market in TWC securities.

In late 1982, TWC engaged the services of the investment banking firm of Goldman, Sachs & Co. to assist it in opposing the Odyssey proxy proposal. Goldman, Sachs prepared an analysis of the Odyssey proposal which criticized Odyssey's financial projections for TWC and its subsidiaries, and which formed the basis for TWC's communications to its shareholders in opposition to the Odyssey solicitation. In addition, Goldman, Sachs was charged by TWC's management with the conduct of an independent review of the financial and structural alternatives available to TWC, including the spin-off of one or more of the subsidiaries. The fact that Goldman, Sachs was conducting such a study was announced by TWC in its proxy materials, and was offered as an additional reason why shareholders should vote against the Odyssey proposal:

> The Company several months ago retained a leading investment banking firm —Goldman, Sachs & Co.—which is providing independent advice with respect to the relative merits of the diversification of Trans World, including the structural and financial alternatives available to the Company. Goldman, Sachs & Co. will report their findings to the Board well ahead of the August 31 date specified in primary subsidiaries of Trans World Corporation to the stockholders to create independently traded public corporations or by selling some of the primary subsidiaries, and that a committee of non-management members of the Board of Directors report to the stockholders by August 31, 1983 on the best means to consummate this separation at the earliest practicable date.
>
> Trans World Corporation Proxy Statement, March 24, 1983, Affidavit of Frank Salizzoni, Exhibit A, at 18–19.

1. 15 U.S.C. § 78j(b).

2. 15 U.S.C. § 77k. Plaintiff's complaint also stated a claim under § 12(2) of the 1933 Act, 15 U.S.C. § 77*l* (2), which has been voluntarily discontinued.

3. The proxy resolution stated, in its effective sentence, that:

   the stockholders of Trans World Corporation, assembled at the 1983 Annual Meeting, request and recommend that the Board of Directors develop and implement a program to separate [the affiliates] by spinning off the

the Odyssey Proposal. In addition, their advice and assistance will continue to be provided on an ongoing basis, in the light of changing conditions, both current and prospective.[4]

After an undisputedly heated proxy contest, involving extensive publicity by Odyssey and TWC's management, the Odyssey shareholder proposition was defeated at the annual meeting held on April 27, 1983.

Despite the defeat of the Odyssey proposal, Goldman, Sachs continued its review of alternatives with respect to TWA and the four other TWC subsidiaries. Although it was originally intended that the Goldman, Sachs study would be ready for consideration by TWC's Board at its July meeting, Goldman, Sachs had not completed it by that time, and the presentation was therefore scheduled for a special meeting of the Board on September 6, 1983.

During this period, TWA continued its loss record with little prospect of improvement. The TWA and TWC Boards were considering the possibility of a public offering of TWA securities to meet TWA's capital requirements. Despite the airline's substantial operating losses in the preceding quarters, the TWA and TWC Boards believed that the market climate was favorable for an issuance of stock. TWA had, beginning in January 1983, offered some of its own securities on the public market, as a result of which TWC's share of TWA's outstanding stock had been reduced from 100% to approximately 80%, and TWA and TWC had sought and obtained approval from their major lenders for sale to the public of up to 40% of TWA.

On July 29, 1983, TWA filed a registration statement with the SEC, and issued a prospectus for the sale of 4,000,000 shares of convertible preferred stock at an initial price of $25 per share. Among the subject headings in the prospectus was one labeled "RELATIONSHIP BETWEEN TWA AND TRANS WORLD." Preceding the description of the existing financial and other relationships between the parent and subsidiary was the following statement:

There may in the future be other arrangements between TWA and Trans World (or other of its subsidiaries). It is intended that the terms of these arrangements will be determined on an arms-length basis. There can be no assurance, however, that these terms will be favorable to TWA or that Trans World will continue to provide TWA with the same level of support for TWA's financing and other needs as it has in the past.[5]

Subsequent to the publication of the prospectus, on September 6, 1983, the results of the Goldman, Sachs study were presented to the TWC Board of Directors. The presentation outlined seven options for the consideration of the Board: Liquidation of TWC through sale of all the subsidiaries; sale of TWC as a single entity; sale of TWA or other subsidiaries individually; continuation of offers of TWA stock to the public; separation of TWC into two entities consisting of TWA and all the other subsidiaries taken together; and retention of the established corporate structure.[6] The Goldman, Sachs presentation was limited to the review of these options "from a financial and market perspective only,"[7] and did not recommend adoption of any particular option.

After the presentation by Goldman, Sachs on September 6, TWC's Board referred the matter to its Finance Committee for further consideration. The Finance Committee met on two occasions, with other members of the Board present and participating. On September 27, the Finance Committee unanimously recommended "that the Board authorize management to develop a detailed program for a possible

---

**4.** Trans World Corporation Proxy Statement, March 24, 1983, Affidavit of Frank Salizzoni, Exhibit A, at 19.

**5.** Prospectus, July 29, 1983, Affidavit of Frank Salizzoni, Exhibit H, at 29.

**6.** Presentation to the Board of Directors, September 6, 1983, Affidavit of Stanley Grossman, Exhibit Y, at 6.

**7.** Presentation Script, Affidavit of Stanley Grossman, Exhibit G, at 5.

separation of TWA from TWC, and to proceed with related preparations." This "spinoff" proposal was considered by the full Board on September 28, at which time it was publicly announced that TWC was considering a plan of separation. Such a plan was formally adopted by the Board on October 26, approved by the shareholders on December 28, and became effective on February 1, 1984. At the time of first announcement that the Board was considering separation, TWA's stock dropped sharply in the market from the $25 per share offering price which plaintiff paid when he purchased shares of the newly-issued preferred stock offering on July 29.

## DISCUSSION

Although the spinoff took place some five months after his purchase, plaintiff charges the defendants with fraudulent conduct in the omission of material facts from the prospectus issued on July 29. Plaintiff contends that TWA and TWC misled potential purchasers by failing to disclose in the prospectus that TWC was considering a spinoff of TWA, and that "Goldman Sachs was preparing to recommend to [TWC] the spinoff of TWA." [8] Plaintiff contends that this information was material because TWA was dependent upon the financial guarantees and other assistance provided by TWC, and that these disclosures were required in order to make other statements in the prospectus not misleading. Accordingly, plaintiff argues, he and the other members of the class, who purchased shares of the newly-issued preferred between July 29 and the September 28 announcement that TWC was considering a spinoff of TWA, were fraudulently deprived of material information upon the absence of which they relied in making their investment decisions.

Defendants, in support of their motion for summary judgment, contend that the undisputed facts establish 'that at the time

plaintiff purchased his shares, which he did on the first day of availability, July 29, 1983, TWC and TWA were under no duty to disclose any facts not contained in the prospectus. Defendants maintain that the undisputed record shows that there were no "plans" to separate TWA from TWC on that date, or at any time before the public announcement that the Board was considering such a proposal on September 28.

To demonstrate that TWC planned to separate TWA from its other holdings at the time that the July 29 offering took place, plaintiff relies heavily upon the statements and conduct of Frank Salizzoni, who was at all material times the Chief Financial Officer of TWC, a member of the Boards of Directors of TWC and TWA, and the officer of TWC most directly involved with the supervision of the Goldman, Sachs study. Salizzoni stated at his deposition that in June 1983 he had come to the "personal opinion" that TWA and TWC "both could be better off if somehow we could separate the airline successfully in some manner." [9] On the basis of this and similar statements, plaintiff argues that despite a "public facade" of continuing study, defendants "behind the scenes ... pursued the separation of TWA." [10] As evidence of this "behind the scenes" determination, plaintiff offers handwritten notes taken by a junior employee of Goldman, Sachs, Mary Anne Cassati, of a meeting between members of the Goldman, Sachs team and Salizzoni on July 7, 1983. Salizzoni states that this meeting was a "status meeting," during the course of which it was determined that the Goldman, Sachs study had not progressed sufficiently to be presented to TWC's Board at its July meeting, as originally planned. Cassati testified at her deposition that she understood the meeting to be a "kick-off" meeting, at which Goldman, Sachs would present its view of its task, and make requests for further information. [11] Cassati's informal notes state, un-

---

8. Complaint, ¶¶ 7, 26, 27.

9. Salizzoni Dep. Tr., at 98.

10. Plaintiff's Memorandum in Opposition, at 16.

11. Affidavit of Frank Salizzoni, ¶ 6; Cassati Dep.Tr. at 20.

der a heading "2 AIRLINE SALE/SPI-NOFF": *"primary*—goal—build liquidity in airline & cut cord w/ TWC so they can walk away." Elsewhere under the same heading, in the margin, is written in large block capitals "TILL DEATH DO US PART."[12] There is no attribution in the document of the source of either of these potentially contradictory statements. Plaintiff argues that this document confirms that before the issuance of the July 29 prospectus, at least one officer and director of TWC had concluded that TWC should "build liquidity" in TWA (presumably through the forthcoming stock offering) so as to subsequently "cut [the] cord ... and walk away." Defendants, while denying the inferences drawn by plaintiff, contend that even if plaintiff's factual premises were true, TWC was not under a duty to reveal the speculations or plans of a single officer and director, or the direction of Goldman, Sachs's unfinished study of possible course of action, and that summary judgment is appropriate.

In passing upon defendants' motion, this Court is mindful of the principle often expressed by our Court of Appeals that summary judgment is a "drastic remedy" in cases such as this;[13] it is a rule too well-settled to require any further elucidation that the Court's only function upon such a motion is to decide whether there are issues of fact to be tried, and not to try them.[14] Rule 56 must nonetheless be enforced where its enforcement is justified, otherwise the Rule becomes a "dead letter."[15]

However variously stated, the essence of plaintiff's claim is that on July 29, 1983, when TWA issued the prospectus and plaintiff purchased his shares, TWC had already determined upon the separation of TWA from TWC, that TWC had a duty to disclose its decision to its investors, and that the existence of this decision was a material matter upon which a reasonable investor would have relied in making his investment choices. Materiality vel non is a mixed question of law and fact, which should ordinarily be determined by the fact-finder upon the trial,[16] but the issue of materiality arises only with respect to facts as to which there was a duty to disclose. Upon the undisputed factual record in this case, taking all facts in the light most favorable to plaintiff and resolving all disputed issues of fact in the plaintiff's favor, the Court is satisfied that, as a matter of law, defendants had no duty to disclose additional information, beyond that contained in the July 29 prospectus, regarding the relationship between TWC and TWA, or the activities of Goldman, Sachs.

It is not disputed that the nature of the relationship between TWC and TWA, in which TWC guaranteed much of the credit upon which TWA did business and financed its substantial requirements for operating capital, was critical to the decisions faced by knowledgeable investors in evaluating TWA's value as an investment, particularly in view of the fact that TWA had suffered substantial losses in the period before July 29, 1983. The prospectus, as noted earlier, addressed itself to this relationship, and

**12.** Affidavit of Stanley Grossman, Exhibit R, at 1.

**13.** *Gary Plastic Packaging Corp. v. Merrill, Lynch,* 756 F.2d 230, 236 (2d Cir.1985); *see Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir.1985); *Seguros Banvenez, S.A. v. S/S Oliver Drescher,* 761 F.2d 855, 859 (2d Cir.1985).

**14.** *Meiri v. Dacon,* 759 F.2d 989, 992 (2d Cir. 1985); *Heyman v. Comm. & Indus. Ins. Co.,* 524 F.2d 1317, 1319–20 (2d Cir.1975).

**15.** *See Colan v. Continental Telecom, Inc.,* 616 F.Supp. 1521, 1525 (S.D.N.Y.1985), *aff'd mem.,* 788 F.2d 2 (2d Cir.1986); *Cf. Meinrath v. Singer,* 482 F.Supp. 457, 460 (S.D.N.Y.1979), *aff'd,* 697 F.2d 293 (2d Cir.1982); *Applegate v. Top Assoc. Inc.,* 300 F.Supp. 51, 53 (S.D.N.Y.1969), *aff'd,* 425 F.2d 92 (2d Cir.1970); *Schwartz v. BMI,* 180 F.Supp. 322, 325 (S.D.N.Y.1959); *Morgan v. Sylvester,* 125 F.Supp. 380, 389 (S.D.N.Y.1954), *aff'd,* 220 F.2d 758 (2d Cir.), *cert. denied,* 350 U.S. 867, 76 S.Ct. 112, 100 L.Ed. 768 (1955).

**16.** *See TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 450, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757 (1976); *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985).

contained numerous statements which informed investors that the existing relationship between TWC and TWA was under review and might be subject to significant change. Even if, as plaintiff contends, Salizzoni, an officer of TWC and TWA and an influential member of the Boards of both companies, had come to an individual judgment as to the nature and advisability of such future change, and even if he had conveyed his views to the Goldman, Sachs team which was preparing its report to the Board, his opinions, speculations, and plans were not matters of fact which defendants were under any duty to disclose. The decisions on fundamental matters of corporate ownership, organization, and governance were not decisions committed to the judgment of a single officer or officers of TWA and TWC; they were matters to be determined in the first instance by the Boards of Directors of the two companies, and ultimately by the stockholders who were the owners of the enterprises.

▮ The opinions of individual officers of the corporation, however strongly held and however disseminated to the corporation's hired consultants, involved forecasts of future contingencies whose "eventual outcome [was] shrouded in uncertainty"; there is no obligation to disclose the content of such contingent speculations, or of the views held by individual directors.[17] There is no dispute that at the time the prospectus was issued, TWC's Board of Directors had not considered a proposal to change the relationship between TWC and TWA; indeed, it is undisputed that no such proposal had been put forward since the defeat by the shareholders of the Odyssey Partners proposal in April. The study which was under way was directed toward the identification and analysis of *options* for consideration by TWC's Board; it is undisputed that Goldman, Sachs put forward no recommendation upon presentation of its report.

Indeed, the course of events after presentation of the Goldman, Sachs report, while not determinative of the question which matters defendants had a duty to disclose on July 29, shows the highly uncertain nature of the proposal to separate TWA from TWC. It is undisputed that the reaction of TWC's Board to the initial presentation of the idea of separation included, in the words of TWC's Chairman and Chief Executive Officer, substantial expressions of "surprise, concern, and opposition."[18] The proposal was initially referred to the Board's Finance Committee, and only after further study and discussion, in which other members of the Board also participated, was the proposal again considered and approved.

The record thus demonstrates that, even granting plaintiff's inferences from the facts established concerning the views of TWC's officers, particularly Salizzoni, in the period before July 29, 1983, any "plans" for the separation of TWA from TWC were the tentative views of individuals regarding the possible outcome of future discussions and deliberations. With the Goldman, Sachs study not completed, while individual directors might have come to individual judgments, these did not reflect final corporate determinations. Indeed, such individual views might well have yielded to contrary opinions held by other directors following discussion at Board meetings. In short, for example, the nature of Salizzoni's views was not a material fact which TWC was required to disclose. To hold otherwise would be to require the disclosure of the views of each of the other directors, all prior to definitive action by the Board. As our Court of Appeals has said, in the related context of incipient merger negotiations, "[w]e are not confronted here with a failure to disclose hard facts which definitely affect a company's financial prospects"; under such circum-

---

**17.** *See Reiss v. Pan American World Airways, Inc.*, 711 F.2d 11, 14 (2d Cir.1983); *Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937, 951 (2d Cir.1969); *Flum Partners v.*

*Child World, Inc.*, 557 F.Supp. 492, 499 (S.D.N.Y. 1983).

**18.** Affidavit of L. Edwin Smart, TWC Chairman & Chief Executive Officer, ¶ 10.

stances, "[d]isclosure may in fact be more misleading than secrecy so far as investment decisions are concerned." [19] The activities of Goldman, Sachs in investigating alternative structures for TWC had been extensively publicized by TWC in connection with the proxy solicitation by Odyssey Partners; the continuation of that investigation was a matter of prudent business judgment in light of the strong shareholder support which had been garnered by Odyssey in the course of its unsuccessful campaign. But it was TWC and TWA's Boards which were charged with receiving the results of that investigation and weighing the seven alternatives set forth in the study; TWC was under no obligation to anticipate the outcome of that deliberative process, and to disclose mere contingencies long in advance of the first consideration of the question by those responsible for decision.

Accordingly, defendants' motion for summary judgment is granted. Judgment may be entered dismissing the complaint.

So ordered.

---

**19.** *Reiss v. Pan American World Airways, Inc.,*     711 F.2d 11, 14 (2d Cir.1983).